# BLOOM *v.* ILLINOIS.

No. 52.   Argued January 16–17, 1968.—Decided May 20, 1968.

*Anthony Bradley Eben* argued the cause for petitioner. With him on the briefs was *Herbert F. Friedman.*

*Edward J. Hladis* argued the cause for respondent. With him on the brief were *John J. Stamos* and *Ronald Butler.*

MR. JUSTICE WHITE delivered the opinion of the Court.

Petitioner was convicted in an Illinois state court of criminal contempt and sentenced to imprisonment for 24 months for willfully petitioning to admit to probate a will falsely prepared and executed after the death of the putative testator. Petitioner made a timely demand for jury trial which was refused. Since in *Duncan* v. *Louisiana, ante,* p. 145, the Constitution was held to guarantee the right to jury trial in serious criminal cases in state courts, we must now decide whether it also guarantees the right to jury trial for a criminal contempt punished by a two-year prison term.

## I.

Whether federal and state courts may try criminal contempt cases without a jury has been a recurring question in this Court. Article III, § 2, of the Constitution provides that "[t]he Trial of all Crimes, except in Cases of Impeachment, shall be by Jury . . . ." The Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." The Fifth and Fourteenth Amendments forbid both the Federal Government and the States from depriving any person of "life, liberty, or property, without due process of law." Notwithstanding these provisions, until *United States* v. *Barnett,* 376 U. S. 681, rehearing denied, 377 U. S. 973 (1964), the Court consistently upheld the constitutional power of the state and federal courts to punish

any criminal contempt without a jury trial. *Eilenbecker* v. *District Court of Plymouth County,* 134 U. S. 31, 36–39 (1890); *I. C. C.* v. *Brimson,* 154 U. S. 447, 488–489 (1894); *In re Debs,* 158 U. S. 564, 594–596 (1895); *Gompers* v. *United States,* 233 U. S. 604, 610–611 (1914); *Green* v. *United States,* 356 U. S. 165, 183–187 (1958).[1] These cases construed the Due Process Clause and the otherwise inclusive language of Article III and the Sixth Amendment as permitting summary trials in contempt cases because at common law contempt was tried without a jury and because the power of courts to punish for contempt without the intervention of any other agency was considered essential to the proper and effective functioning of the courts and to the administration of justice.

*United States* v. *Barnett, supra,* signaled a possible change of view. The Court of Appeals for the Fifth Circuit certified to this Court the question whether there was a right to jury trial in an impending contempt proceeding. Following prior cases, a five-man majority held that there was no constitutional right to jury trial in all contempt cases. Criminal contempt, intrinsically and aside from the particular penalty imposed, was not

---

[1] Many more cases have supported the rule that courts may punish criminal contempt summarily, or accepted that rule without question. See cases collected in *Green* v. *United States,* 356 U. S. 165, 191, n. 2 (1958) (concurring opinion); *United States* v. *Barnett,* 376 U. S. 681, 694, n. 12 (1964). The list of the Justices of this Court who have apparently subscribed to this view is long. See *Green* v. *United States, supra,* at 192.

The argument that the power to punish contempt was an inherent power of the courts not subject to regulation by Congress was rejected in *Michaelson* v. *United States ex rel. Chicago, St. P., M. & O. R. Co.,* 266 U. S. 42, 65–67 (1924), which upheld the maximum sentence and jury trial provisions of the Clayton Act. Cf. Larremore, Constitutional Regulation of Contempt of Court, 13 Harv. L. Rev. 615 (1900).

deemed a serious offense requiring the protection of the constitutional guarantees of the right to jury trial. However, the Court put aside as not raised in the certification or firmly settled by prior cases, the issue whether a severe punishment would itself trigger the right to jury trial and indicated, without explication, that some members of the Court were of the view that the Constitution limited the punishment which could be imposed where the contempt was tried without a jury. 376 U. S., at 694–695 and n. 12.

Two years later, in *Cheff* v. *Schnackenberg,* 384 U. S. 373 (1966), which involved a prison term of six months for contempt of a federal court, the Court rejected the claim that the Constitution guaranteed a right to jury trial in all criminal contempt cases. Contempt did not "of itself" warrant treatment as other than a petty offense; the six months' punishment imposed permitted dealing with the case as a prosecution for "a petty offense, which under our decisions does not require a jury trial." 384 U. S. 373, 379–380 (1966). See *Callan* v. *Wilson,* 127 U. S. 540 (1888); *Schick* v. *United States,* 195 U. S. 65 (1904); *District of Columbia* v. *Clawans,* 300 U. S. 617 (1937). It was not necessary in *Cheff* to consider whether the constitutional guarantees of the right to jury trial applied to a prosecution for a serious contempt. Now, however, because of our holding in *Duncan* v. *Louisiana, supra,* that the right to jury trial extends to the States, and because of Bloom's demand for a jury in this case, we must once again confront the broad rule that all criminal contempts can be constitutionally tried without a jury. *Barnett* presaged a re-examination of this doctrine at some later time; that time has now arrived.

In proceeding with this task, we are acutely aware of the responsibility we assume in entertaining challenges to a constitutional principle which is firmly entrenched

and which has behind it weighty and ancient authority. Our deliberations have convinced us, however, that serious contempts are so nearly like other serious crimes that they are subject to the jury trial provisions of the Constitution, now binding on the States, and that the traditional rule is constitutionally infirm insofar as it permits other than petty contempts to be tried without honoring a demand for a jury trial. We accept the judgment of *Barnett* and *Cheff* that criminal contempt is a petty offense unless the punishment makes it a serious one; but, in our view, dispensing with the jury in the trial of contempts subjected to severe punishment represents an unacceptable construction of the Constitution, "an unconstitutional assumption of powers by the [courts] which no lapse of time or respectable array of opinion should make us hesitate to correct." *Black & White Taxicab & Transfer Co.* v. *Brown & Yellow Taxicab & Transfer Co.*, 276 U. S. 518, 533 (1928) (Holmes, J., dissenting). The rule of our prior cases has strong, though sharply challenged, historical support; [2] but neither this circumstance nor the considera-

---

[2] Blackstone's description of the common-law practice in contempt cases appears in 4 Commentaries on the Laws of England 286–287:

"The process of attachment for these and the like contempts must necessarily be as ancient as the laws themselves; for laws without a competent authority to secure their administration from disobedience and contempt would be vain and nugatory. A power, therefore, in the supreme courts of justice, to suppress such contempts by an immediate attachment of the offender results from the first principles of judicial establishments, and must be an inseparable attendant upon every superior tribunal.

. . . . .

"If the contempt be committed in the face of the court, the offender may be instantly apprehended and imprisoned, at the discretion of the judges, without any further proof or examination. But in matters that arise at a distance, and of which the court cannot have so perfect a knowledge, unless by the confession of the party or the testimony of others, if the judges upon *affidavit* see sufficient

tions of necessity and efficiency normally offered in defense of the established rule, justify denying a jury trial in serious criminal contempt cases.  The Constitu-

ground to suspect that a contempt has been committed, they either make a rule on the suspected party to show cause why an attachment should not issue against him, or, in very flagrant instances of contempt, the attachment issues in the first instance; as it also does if no sufficient cause be shown to discharge; and thereupon the court confirms and makes absolute the original rule." And see *id.*, at 280.  A similar account is contained in 2 W. Hawkins, A Treatise of the Pleas of the Crown 4, 141 (2d ed. 1724).

Of course, "Blackstone's Commentaries are accepted as the most satisfactory exposition of the common law of England. . . .  [U]ndoubtedly the framers of the Constitution were familiar with it." *Schick* v. *United States,* 195 U. S. 65, 69 (1904).

Blackstone, however, was acutely aware that this practice was a significant departure from ordinary principles: "It cannot have escaped the attention of the reader that this method of making the defendant answer upon oath to a criminal charge is not agreeable to the genius of the common law in any other instance . . . ."  4 Blackstone, *supra,* at 287.

The unalloyed doctrine that by "immemorial usage" all criminal contempts could be tried summarily seems to derive from Mr. Justice (later Chief Justice) Wilmot's undelivered opinion in *The King* v. *Almon* (1765), first brought to public light by the posthumous publication of his papers, Wilmot, Notes 243 (1802), reprinted in 97 Eng. Rep. 94.  Wilmot's opinion appears to have been the source of Blackstone's view, but did not become an authoritative part of the law of England until *Rex* v. *Clement,* 4 Barn. & Ald. 218, 233, 106 Eng. Rep. 918, 923 (K. B. 1821).  Cf. *Roach* v. *Garvan,* 2 Atk. 469, 26 Eng. Rep. 683 (Ch. 1742).  See discussion in 8 How. St. Tr. 14, 22–23, 49–59, and the subsequent civil action, *Burdett* v. *Abbot,* 14 East 1, 138, 104 Eng. Rep. 501, 554 (K. B. 1811); 4 Taunt. 401, 128 Eng. Rep. 384 (Ex. 1812); 5 Dow 165, 202, 3 Eng. Rep. 1289, 1302 (H. L. 1817).  The historical authenticity of this view has been vigorously challenged, initially by Solly-Flood, The Story of Prince Henry of Monmouth and Chief-Justice Gascoign, 3 Transactions of the Royal Historical Society (N. S.) 47, 61–64, 147–150 (1886).  This led to the massive reappraisal of the contempt power undertaken by Sir John Fox: *The King* v. *Almon,* Pts. 1 & 2, 24 L. Q. Rev. 184, 266 (1908); The Summary Process to Punish Contempt, Pts. 1 & 2, 25 L. Q. Rev. 238, 354 (1909); Eccentricities

tion guarantees the right to jury trial in state court prosecutions for contempt just as it does for other crimes.

---

of the Law of Contempt of Court, 36 L. Q. Rev. 394 (1920); The Nature of Contempt of Court, 37 L. Q. Rev. 191 (1921); The Practice in Contempt of Court Cases, 38 L. Q. Rev. 185 (1922); The Writ of Attachment, 40 L. Q. Rev. 43 (1924); J. Fox, The History of Contempt of Court (1927). On contempt generally, see R. Goldfarb, The Contempt Power (1963).

Learned writers have interpreted Fox's work as showing that until the late 17th or early 18th centuries, apart from the extraordinary proceedings of the Star Chamber, English courts neither had, nor claimed, power to punish contempts, whether in or out of court, by summary process. Frankfurter & Landis, Power of Congress over Procedure in Criminal Contempts in "Inferior" Federal Courts—A Study in Separation of Powers, 37 Harv. L. Rev. 1010, 1042–1052 (1924). Cf. J. Oswald, Contempt of Court 3, n. (g) (Robertson ed., 1910). Fox's own appraisal of the evidence, however, seems to have been that prior to the 18th century there probably was no valid basis for summary punishment of a libel on the court by a stranger to the proceedings, but that summary punishment for contempts outside the court consisting in resistance to a lawful process or order of the court, or contumacious behavior by an officer of the court, was probably permissible. J. Fox, The History of Contempt of Court 4, 49–50, 98–100, 108–110, 208–209 (1927); Fox, The Summary Process to Punish Contempt, Pt. 1, 25 L. Q. Rev. 238, 244-246 (1909). Although jury trials had been provided in some instances of contempt in the face of the court, Fox does not seem to have questioned that such contempts could be punished summarily. J. Fox, The History of Contempt of Court 50 (1927).

We do not find the history of criminal contempt sufficiently simple or unambiguous to rest rejection of our prior decisions entirely on historical grounds, particularly since the Court has been aware of Solly-Flood's and Fox's work for many years. See *Gompers* v. *United States*, 233 U. S. 604, 611 (1914); *Michaelson* v. *United States ex rel. Chicago, St. P., M. & O. R. Co.*, 266 U. S. 42, 66–67 (1924); *Green* v. *United States*, 356 U. S. 165, 185, n. 18 (1958). In any event, the ultimate question is not whether the traditional doctrine is historically correct but whether the rule that criminal contempts are never entitled to a jury trial is a necessary or an acceptable construction of the Constitution. Cf. *Thompson* v. *Utah*, 170 U. S. 343, 350 (1898).

## II.

Criminal contempt is a crime in the ordinary sense; it is a violation of the law, a public wrong which is punishable by fine or imprisonment or both. In the words of Mr. Justice Holmes:

"These contempts are infractions of the law, visited with punishment as such. If such acts are not criminal, we are in error as to the most fundamental characteristic of crimes as that word has been understood in English speech." *Gompers* v. *United States,* 233 U. S. 604, 610 (1914).[3]

Criminally contemptuous conduct may violate other provisions of the criminal law; but even when this is not the case convictions for criminal contempt are indistinguishable from ordinary criminal convictions, for their impact on the individual defendant is the same. Indeed, the role of criminal contempt and that of many ordinary criminal laws seem identical—protection of the institutions of our government and enforcement of their mandates.

Given that criminal contempt is a crime in every fundamental respect, the question is whether it is a crime to which the jury trial provisions of the Constitution

---

[3] See also *New Orleans* v. *The Steamship Co.,* 20 Wall. 387, 392 (1874) ("[c]ontempt of court is a specific criminal offence"); *O'Neal* v. *United States,* 190 U. S. 36, 38 (1903) (an adjudication for contempt is "in effect a judgment in a criminal case"); *Bessette* v. *W. B. Conkey Co.,* 194 U. S. 324, 336 (1904) (that criminal contempt proceedings are "criminal in their nature has been constantly affirmed"); *Michaelson* v. *United States ex rel. Chicago, St. P., M. & O. R. Co.,* 266 U. S. 42, 66 (1924) ("[t]he fundamental characteristics of both [crimes and criminal contempts] are the same"); *Green* v. *United States,* 356 U. S. 165, 201 (1958) (BLACK, J., dissenting) ("criminal contempt is manifestly a crime by every relevant test of reason or history"). The Court also held in *Bessette, supra,* at 335, that criminal contempt "cannot be considered as an infamous crime."

apply. We hold that it is, primarily because in terms of those considerations which make the right to jury trial fundamental in criminal cases, there is no substantial difference between serious contempts and other serious crimes. Indeed, in contempt cases an even more compelling argument can be made for providing a right to jury trial as a protection against the arbitrary exercise of official power. Contemptuous conduct, though a public wrong, often strikes at the most vulnerable and human qualities of a judge's temperament. Even when the contempt is not a direct insult to the court or the judge, it frequently represents a rejection of judicial authority, or an interference with the judicial process or with the duties of officers of the court.

The court has long recognized the potential for abuse in exercising the summary power to imprison for contempt—it is an "arbitrary" power which is "liable to abuse." *Ex parte Terry,* 128 U. S. 289, 313 (1888). "[I]ts exercise is a delicate one and care is needed to avoid arbitrary or oppressive conclusions." *Cooke* v. *United States,* 267 U. S. 517, 539 (1925).[4]

These apprehensions about the unbridled power to punish summarily for contempt are reflected in the march of events in both Congress and the courts since our Constitution was adopted. The federal courts were established by the Judiciary Act of 1789; § 17 of the Act provided that those courts "shall have power to . . . punish by fine or imprisonment, at the discretion of said courts, all contempts of authority in any cause or hearing before the same . . . ." 1 Stat. 83. See *Anderson* v.

---

[4] "That contempt power over counsel, summary or otherwise, is capable of abuse is certain. Men who make their way to the bench sometimes exhibit vanity, irascibility, narrowness, arrogance, and other weaknesses to which human flesh is heir." *Sacher* v. *United States,* 343 U. S. 1, 12 (1952). See also *Ex parte Hudgings,* 249 U. S. 378 (1919); *Nye* v. *United States,* 313 U. S. 33 (1941); *Cammer* v. *United States,* 350 U. S. 399 (1956).

*Dunn,* 6 Wheat. 204, 227–228 (1821). This open-ended authority to deal with contempt, limited only as to mode of punishment, proved unsatisfactory to Congress. Abuses under the 1789 Act culminated in the unsuccessful impeachment proceedings against James Peck, a federal district judge who had imprisoned and disbarred one Lawless for publishing a criticism of one of Peck's opinions in a case which was on appeal. The result was drastic curtailment of the contempt power in the Act of 1831, 4 Stat. 487. *Ex parte Robinson,* 19 Wall. 505, 510–511 (1874); *In re Savin,* 131 U. S. 267, 275–276 (1889). That Act limited the contempt power to misbehavior in the presence of the court or so near thereto as to obstruct justice; misbehavior of court officers in their official transactions; and disobedience of or resistance to the lawful writ, process, order, or decree of the court.[5] This major revision of the contempt power in the federal sphere, which "narrowly confined" and "substantially curtailed" the authority to punish contempt summarily, *Nye* v. *United States,* 313 U. S. 33, 47–48 (1941), has continued to the present day as the basis for the general

---

[5] Section 1 of the Act of 1831 stated:

"That the power of the several courts of the United States to issue attachments and inflict summary punishments for contempts of court, shall not be construed to extend to any cases except the misbehaviour of any person or persons in the presence of the said courts, or so near thereto as to obstruct the administration of justice, the misbehaviour of any of the officers of the said courts in their official transactions, and the disobedience or resistance by any officer of the said courts, party, juror, witness, or any ,other person or persons, to any lawful writ, process, order, rule, decree, or command of the said courts." Fox concluded that the 1831 Act was in accord with the general common law of England. See J. Fox, The History of Contempt of Court 208 (1927). Section 2 of the Act provided for prosecution by the regular criminal procedures of those guilty of obstruction of justice. See generally Nelles & King, Pts. 1 & 2, Contempt by Publication in the United States, 28 Col. L. Rev. 401, 525 (1928).

power to punish criminal contempt.[6]   62 Stat. 701, 18 U. S. C. § 401.

The courts also proved sensitive to the potential for abuse which resides in the summary power to punish contempt.   Before the 19th century was out, a distinction had been carefully drawn between contempts occurring within the view of the court, for which a hearing and formal presentation of evidence were dispensed with, and all other contempts where more normal adversary procedures were required.   *Ex parte Terry,* 128 U. S. 289 (1888); *In re Savin,* 131 U. S. 267 (1889).   Later,

---

[6] At a later date, when passing the Clayton Act, Congress focused its attention on conduct which was not only criminally contemptuous but which also constituted other crimes under federal or state law.   Contempts of this nature, unless committed in the presence of the court or so near thereto as to obstruct justice, or unless they involved disobedience to a court writ, process, order, or decree in a case brought by the United States, were required to be tried to a jury, and the possible punishment was limited to six months, a fine of $1,000, or both.   38 Stat. 738, § 21, now 18 U. S. C. § 402. Circumscription of the contempt power was carried further in the Norris-LaGuardia Act, which extended the right to jury trial to contempt cases arising out of injunctions issued in labor disputes.   47 Stat. 72, § 11, now 18 U. S. C. § 3692.   The Civil Rights Act of 1957, 71 Stat. 638, § 151, 42 U. S. C. § 1995, provides a right to a *de novo* trial by jury to all criminal contemnors convicted in cases arising under the Act who are fined in excess of $300 or sentenced to imprisonment for more than 45 days, exception being made for contempts committed in the presence of the court or so near thereto as to obstruct justice, and misbehavior, misconduct, or disobedience of any officer of the court.   The Civil Rights Act of 1964, 78 Stat. 268, § 1101, 42 U. S. C. § 2000h, provides a right to jury trial in all proceedings for criminal contempt arising under the Act, and limits punishment to a fine of $1,000 or imprisonment for six months. Again exception is made for contempts committed in the presence of the court, or so near thereto as to obstruct justice, and for the misbehavior, misconduct, or disobedience of court officers.   Proof of criminal *mens rea* is specifically required.   See Goldfarb & Kurzman, Civil Rights v. Civil Liberties: The Jury Trial Issue, 12 U. C. L. A. L. Rev. 486, 496–506 (1965).

the Court could say "it is certain that in proceedings for criminal contempt the defendant is presumed to be innocent, he must be proved to be guilty beyond a reasonable doubt, and cannot be compelled to testify against himself." *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418, 444 (1911). See *Michaelson* v. *United States ex rel. Chicago, St. P., M. & O. R. Co.*, 266 U. S. 42, 66 (1924). Chief Justice Taft speaking for a unanimous Court in *Cooke* v. *United States,* 267 U. S. 517, 537 (1925), said:

> "Due process of law, therefore, in the prosecution of contempt, except of that committed in open court, requires that the accused should be advised of the charges and have a reasonable opportunity to meet them by way of defense or explanation. We think this includes the assistance of counsel, if requested, and the right to call witnesses to give testimony, relevant either to the issue of complete exculpation or in extenuation of the offense and in mitigation of the penalty to be imposed."

Cf. *Blackmer* v. *United States,* 284 U. S. 421, 440 (1932). It has also been recognized that the defendant in criminal contempt proceedings is entitled to a public trial before an unbiased judge, *In re Oliver,* 333 U. S. 257 (1948); *Offutt* v. *United States,* 348 U. S. 11 (1954); see *Ungar* v. *Sarafite,* 376 U. S. 575 (1964); but cf. *Levine* v. *United States,* 362 U. S. 610 (1960).[7] In the federal system many of the procedural protections available to criminal contemnors are set forth in Fed. Rule Crim. Proc. 42.

Judicial concern has not been limited to procedure. In *Toledo Newspaper Co.* v. *United States,* 247 U. S.

---

[7] It has also been held that a defendant in criminal contempt proceedings is eligible for executive pardon, *Ex parte Grossman,* 267 U. S. 87 (1925), and entitled to the protection of the statute of limitations, *Gompers* v. *United States,* 233 U. S. 604, 611–613 (1914); *Pendergast* v. *United States,* 317 U. S. 412 (1943).

402 (1918), the Court endorsed a broad construction of the language of the Act of 1831 permitting summary trial of contempts "so near [to the court] as to obstruct the administration of justice." It required only that the conduct have a "tendency to prevent and obstruct the discharge of judicial duty . . . ." *Id.*, at 419. See *Craig* v. *Hecht,* 263 U. S. 255, 277 (1923). This view proved aberrational and was overruled in *Nye* v. *United States,* 313 U. S. 33, 47–52 (1941), which narrowly limited the conduct proscribed by the 1831 Act to "misbehavior in the vicinity of the court disrupting to quiet and order or actually interrupting the court in the conduct of its business." *Id.*, at 52. Cf. *Toledo Newspaper Co.* v. *United States, supra,* at 422 (Holmes, J., dissenting). The congressional purpose to fence in the power of the federal courts to punish contempt summarily was further implemented in *Cammer* v. *United States,* 350 U. S. 399, 407–408 (1956). A lawyer, the Court held, "is not the kind of 'officer' who can be summarily tried for contempt under 18 U. S. C. § 401 (2)." In another development, the First Amendment was invoked to ban punishment for a broad category of arguably contemptuous out-of-court conduct. *Bridges* v. *California,* 314 U. S. 252 (1941); *Pennekamp* v. *Florida,* 328 U. S. 331 (1946); *Craig* v. *Harney,* 331 U. S. 367 (1947). Finally, over the years in the federal system there has been a recurring necessity to set aside punishments for criminal contempt as either unauthorized by statute or too harsh. *E. g., Ex parte Robinson,* 19 Wall. 505 (1874); *United States* v. *United Mine Workers,* 330 U. S. 258 (1947); *Yates* v. *United States,* 355 U. S. 66 (1957).[8]

---

[8] Limitations on the maximum penalties for criminal contempt are common in the States. According to Note, Constitutional Law: The Supreme Court Constructs a Limited Right to Trial by Jury for Federal Criminal Contemnors, 1967 Duke L. J. 632, 654, n. 84, in 26 States the maximum penalty that can be imposed in the absence of a

This course of events demonstrates the unwisdom of vesting the judiciary with completely untrammeled power to punish contempt, and makes clear the need for effective safeguards against that power's abuse. Prosecutions for contempt play a significant role in the proper functioning of our judicial system; but despite the important values which the contempt power protects, courts and legislatures have gradually eroded the power of judges to try contempts of their own authority. In modern times, procedures in criminal contempt cases have come to mirror those used in ordinary criminal cases. Our experience teaches that convictions for criminal contempt, not infrequently resulting in extremely serious penalties, see *United States* v. *Barnett,* 376 U. S. 681, 751 (Goldberg, J., dissenting), are indistinguishable from those obtained under ordinary criminal

jury trial is six months or less, in three States a jury trial must be provided upon demand of the defendant, in three other States the maximum penalty cannot exceed one year (this group of States includes Illinois, however, which, as the present case demonstrates, has no such limitation), in 15 States there is either no limitation upon the maximum penalty which may be imposed, or else that maximum exceeds one year, and finally, in three States, while there are statutes relating to particular kinds of contempt, there are no general contempt provisions. Independent examination suggests that the available materials concerning the law of contempt in some States are such that precise computation is difficult. It is clear, however, that punishment for contempt is limited to one year or less in over half the States.

Most other Western countries seem to be highly restrictive of the latitude given judges to try their own contempts without a jury. See Jann, Contempt of Court in Western Germany, 8 Am. U. L. Rev. 34 (1959); Bigelow, Contempt of Court, 1 Crim. L. Q. 475 (1959); Pekelis, Legal Techniques and Political Ideologies: A Comparative Study, 41 Mich. L. Rev. 665 (1943). By contrast, there was no right of appeal against a conviction for criminal contempt in England until the Administration of Justice Act, 1960, 8 & 9 Eliz. 2, c. 65. See Harnon, Civil and Criminal Contempts of Court, 25 Mod. L. Rev. 179 (1962).

laws. If the right to jury trial is a fundamental matter in other criminal cases, which we think it is, it must also be extended to criminal contempt cases.

## III.

Nor are there compelling reasons for a contrary result. As we read the earlier cases in this Court upholding the power to try contempts without a jury, it was not doubted that the summary power was subject to abuse or that the right to jury trial would be an effective check. Rather, it seems to have been thought that summary power was necessary to preserve the dignity, independence, and effectiveness of the judicial process—"To submit the question of disobedience to another tribunal, be it a jury or another court, would operate to deprive the proceeding of half its efficiency." *In re Debs*, 158 U. S. 564, 595 (1895). It is at this point that we do not agree: in our judgment, when serious punishment for contempt is contemplated, rejecting a demand for jury trial cannot be squared with the Constitution or justified by considerations of efficiency or the desirability of vindicating the authority of the court.

We cannot say that the need to further respect for judges and courts is entitled to more consideration than the interest of the individual not to be subjected to serious criminal punishment without the benefit of all the procedural protections worked out carefully over the years and deemed fundamental to our system of justice. Genuine respect, which alone can lend true dignity to our judicial establishment, will be engendered, not by the fear of unlimited authority, but by the firm administration of the law through those institutionalized procedures which have been worked out over the centuries.

We place little credence in the notion that the independence of the judiciary hangs on the power to try contempts summarily and are not persuaded that the

additional time and expense possibly involved in submitting serious contempts to juries will seriously handicap the effective functioning of the courts. We do not deny that serious punishment must sometimes be imposed for contempt, but we reject the contention that such punishment must be imposed without the right to jury trial. The goals of dispatch, economy, and efficiency are important, but they are amply served by preserving the power to commit for civil contempt and by recognizing that many contempts are not serious crimes but petty offenses not within the jury trial provisions of the Constitution. When a serious contempt is at issue, considerations of efficiency must give way to the more fundamental interest of ensuring the even-handed exercise of judicial power. In isolated instances recalcitrant or irrational juries may acquit rather than apply the law to the case before them. Our system has wrestled with this problem for hundreds of years, however, and important safeguards have been devised to minimize miscarriages of justice through the malfunctioning of the jury system. Perhaps to some extent we sacrifice efficiency, expedition, and economy, but the choice in favor of jury trial has been made, and retained, in the Constitution. We see no sound reason in logic or policy not to apply it in the area of criminal contempt.

Some special mention of contempts in the presence of the judge is warranted. Rule 42 (a) of the Federal Rules of Criminal Procedure provides that "[a] criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court." This rule reflects the common-law rule which is widely if not uniformly followed in the States. Although Rule 42 (a) is based in part on the premise that it is not necessary specially to present the facts of a contempt which occurred in the very presence of the

judge, it also rests on the need to maintain order and a deliberative atmosphere in the courtroom. The power of a judge to quell disturbance cannot attend upon the impaneling of a jury. There is, therefore, a strong temptation to make exception to the rule we establish today for disorders in the courtroom. We are convinced, however, that no such special rule is needed. It is old law that the guarantees of jury trial found in Article III and the Sixth Amendment do not apply to petty offenses. Only today we have reaffirmed that position. *Duncan* v. *Louisiana, supra,* at 159–162. By deciding to treat criminal contempt like other crimes insofar as the right to jury trial is concerned, we similarly place it under the rule that petty crimes need not be tried to a jury.

## IV.

Petitioner Bloom was held in contempt of court for filing a spurious will for probate. At his trial it was established that the putative testator died on July 6, 1964, and that after that date Pauline Owens, a practical nurse for the decedent, engaged Bloom to draw and execute a will in the decedent's name. The will was dated June 21, 1964. Bloom knew the will was false when he presented it for admission in the Probate Division of the Circuit Court of Cook County. The State's Attorney of that county filed a complaint charging Bloom with contempt of court. At trial petitioner's timely motion for a jury trial was denied. Petitioner was found guilty of criminal contempt and sentenced to imprisonment for 24 months. On direct appeal to the Illinois Supreme Court, his conviction was affirmed. That court held that neither state law nor the Federal Constitution provided a right to jury trial in criminal contempt proceedings. 35 Ill. 2d 255, 220 N. E. 2d 475 (1966). We granted certiorari, 386 U. S. 1003 (1967).

Petitioner Bloom contends that the conduct for which he was convicted of criminal contempt constituted the

crime of forgery under Ill. Rev. Stat., c. 38, § 17–3. Defendants tried under that statute enjoy a right to jury trial and face a possible sentence of one to 14 years, a fine not to exceed $1,000, or both. Petitioner was not tried under this statute, but rather was convicted of criminal contempt. Under Illinois law no maximum punishment is provided for convictions for criminal contempt. *People* v. *Stollar,* 31 Ill. 2d 154, 201 N. E. 2d 97 (1964). In *Duncan* we have said that we need not settle "the exact location of the line between petty offenses and serious crimes" but that "a crime punishable by two years in prison is . . . a serious crime and not a petty offense." *Supra,* at 161, 162. Bloom was sentenced to imprisonment for two years. Our analysis of *Barnett, supra,* and *Cheff* v. *Schnackenberg,* 384 U. S. 373, makes it clear that criminal contempt is not a crime of the sort that requires the right to jury trial regardless of the penalty involved. Under the rule in *Cheff,* when the legislature has not expressed a judgment as to the seriousness of an offense by fixing a maximum penalty which may be imposed, we are to look to the penalty actually imposed as the best evidence of the seriousness of the offense. See *Duncan, supra,* at 162, n. 35. Under this rule it is clear that Bloom was entitled to the right to trial by jury, and it was constitutional error to deny him that right. Accordingly, we reverse and remand for proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE FORTAS, concurring.*

I join the judgments and opinions of the Court in these cases because I agree that the Due Process Clause of the Fourteenth Amendment requires that the States accord the right to jury trial in prosecutions for offenses

---

*[This opinion applies also to No. 410, *Duncan* v. *Louisiana, ante,* p. 145.]

that are not petty. A powerful reason for reaching this conclusion is that the Sixth Amendment to the Constitution guarantees the right to jury trial in federal prosecutions for such offenses. It is, of course, logical and reasonable that in seeking, from time to time, the content of "due process of law," we should look to and be guided by the great Bill of Rights in our Constitution. Considerations of the practice of the forum States, of the States generally, and of the history and office of jury trials are also relevant to our task. I believe, as my Brother White's opinion for the Court in *Duncan* v. *Louisiana* persuasively argues, that the right to jury trial in major prosecutions, state as well as federal, is so fundamental to the protection of justice and liberty that "due process of law" cannot be accorded without it.

It is the progression of history, and especially the deepening realization of the substance and procedures that justice and the demands of human dignity require, which has caused this Court to invest the command of "due process of law" with increasingly greater substance. The majority lists outstanding stations in this progression, *ante,* at 147–148. This Court has not been alone in its progressive recognition of the content of the great phrase which my Brother White describes as "spacious language" and Learned Hand called a "majestic generality." The Congress, state courts, and state legislatures have moved forward with the advancing conception of human rights in according procedural as well as substantive rights to individuals accused of conflict with the criminal laws.†

---

† See, *e. g.,* Bail Reform Act of 1966, Pub. L. 89–465, 18 U. S. C. § 3141 *et seq.* (1964 ed., Supp. II); Criminal Justice Act of 1964, Pub. L. 88–455, 18 U. S. C. § 3006A; Jury Selection and Service Act of 1968, Pub. L. 90–274, 82 Stat. 53; *Schowgurow* v. *State,* 240 Md. 121, 213 A. 2d 475 (1965); Note, The Proposed Penal Law of New York, 64 Col. L. Rev. 1469 (1964).

But although I agree with the decision of the Court, I cannot agree with the implication, see *ante,* at 158–159, n. 30, that the tail must go with the hide: that when we hold, influenced by the Sixth Amendment, that "due process" requires that the States accord the right of jury trial for all but petty offenses, we automatically import all of the ancillary rules which have been or may hereafter be developed incidental to the right to jury trial in the federal courts. I see no reason whatever, for example, to assume that our decision today should require us to impose federal requirements such as unanimous verdicts or a jury of 12 upon the States. We may well conclude that these and other features of federal jury practice are by no means fundamental—that they are not essential to due process of law—and that they are not obligatory on the States.

I would make these points clear today. Neither logic nor history nor the intent of the draftsmen of the Fourteenth Amendment can possibly be said to require that the Sixth Amendment or its jury trial provision be applied to the States together with the total gloss that this Court's decisions have supplied. The draftsmen of the Fourteenth Amendment intended what they said, not more or less: that no State shall deprive any person of life, liberty, or property without due process of law. It is ultimately the duty of this Court to interpret, to ascribe specific meaning to this phrase. There is no reason whatever for us to conclude that, in so doing, we are bound slavishly to follow not only the Sixth Amendment but all of its bag and baggage, however securely or insecurely affixed they may be by law and precedent to federal proceedings. To take this course, in my judgment, would be not only unnecessary but mischievous because it would inflict a serious blow upon the principle of federalism. The Due Process Clause commands us to apply its great standard to state court proceedings

to assure basic fairness. It does not command us rigidly and arbitrarily to impose the exact pattern of federal proceedings upon the 50 States. On the contrary, the Constitution's command, in my view, is that in our insistence upon state observance of due process, we should, so far as possible, allow the greatest latitude for state differences. It requires, within the limits of the lofty basic standards that it prescribes for the States as well as the Federal Government, maximum opportunity for diversity and minimal imposition of uniformity of method and detail upon the States. Our Constitution sets up a federal union, not a monolith.

This Court has heretofore held that various provisions of the Bill of Rights such as the freedom of speech and religion guarantees of the First Amendment, the prohibition of unreasonable searches and seizures in the Fourth Amendment, the privilege against self-incrimination of the Fifth Amendment, and the right to counsel and to confrontation under the Sixth Amendment "are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *Malloy* v. *Hogan,* 378 U. S. 1, 10 (1964); *Pointer* v. *Texas,* 380 U. S. 400, 406 (1965); *Miranda* v. *Arizona,* 384 U. S. 436, 464 (1966). I need not quarrel with the specific conclusion in those specific instances. But unless one adheres slavishly to the incorporation theory, body and substance, the same conclusion need not be superimposed upon the jury trial right. I respectfully but urgently suggest that it should not be. Jury trial is more than a principle of justice applicable to individual cases. It is a system of administration of the business of the State. While we may believe (and I do believe) that the right of jury trial is fundamental, it does not follow that the particulars of according that right must be uniform. We

should be ready to welcome state variations which do not impair—indeed, which may advance—the theory and purpose of trial by jury.

Mr. Justice Harlan, whom Mr. Justice Stewart joins, dissenting.

I dissent for the reasons expressed in my dissenting opinion in *Duncan* v. *Louisiana, ante,* p. 171, and in my separate opinion in *Cheff* v. *Schnackenberg,* 384 U. S. 373, 380. See also *United States* v. *Barnett,* 376 U. S. 681; *Green* v. *United States,* 356 U. S. 165.

This case completes a remarkable circle. In *Duncan, supra,* the Court imposed on the States a rule of procedure that was neither shown to be fundamental to procedural fairness nor held to be part of the originally understood content of the Fourteenth Amendment. The sole justification was that the rule was found in the Bill of Rights. The Court now, without stating any additional reasons, imposes on the States a related rule that, as recently as *Cheff* v. *Schnackenberg, supra,* the Court declined to find in the Bill of Rights. That the words of Mr. Justice Holmes,* inveighing against a century of "unconstitutional assumption of [state] powers by the Courts of the United States" in derogation of the central premise of our Constitution, should be invoked to support the Court's action here can only be put down to the vagaries of the times.

---

*\*Black & White Taxicab & Transfer Co.* v. *Brown & Yellow Taxicab & Transfer Co.,* 276 U. S. 518, 532, at 533 (dissenting opinion, quoted *ante,* at 198).