STATE OF TENNESSEE, ex rel.   )
PEGGY A. RICHARDSON,      )
                               )

      Plaintiff/Appellee,      )      Appeal No.
                               )      01-A-01-9706-CV-00274
v.                          )
                               )      Davidson Circuit
MICHAEL W. RICHARDSON,   )      No.  88D-1286
                               )

      Defendant/Appellant.   )
                               )

**FILED**

September 23, 1998

Cecil W. Crowson
Appellate Court Clerk

COURT OF APPEALS OF TENNESSEE


APPEAL FROM THE CIRCUIT COURT FOR DAVIDSON COUNTY

AT NASHVILLE, TENNESSEE


THE HONORABLE MURIEL ROBINSON, JUDGE


JOHN KNOX WALKUP
Attorney General & Reporter

KIMBERLY M. FRAYN
Assistant Attorney General
General Civil Division
425 Fifth Avenue North
Cordell Hull Building, 2nd Floor
Nashville, Tennessee  37243-0499
      ATTORNEYS FOR PLAINTIFF/APPELLEE



CLARK LEE SHAW
2525 Lebanon Road
Nashville, Tennessee  37214
      ATTORNEY FOR DEFENDANT/APPELLANT




REVERSED AND REMANDED




WALTER W. BUSSART, SPECIAL JUDGE

# OPINION

Appellant Michael Richardson is the former husband of Peggy Richardson and they are the parents of the minor child whose financial support is the basis for this case. The State of Tennessee ex rel Ms. Richardson filed a petition for contempt seeking a judgment for the accumulated arrearage in child support. The lower court found Mr. Richardson in criminal contempt of court pursuant to Tennessee Code Annotated sections 29-9-102 and 29-9-103[1] and granted an arrearage judgment against him in the amount of $18,194.58. He has appealed to this court.

The parties were divorced in 1988 at which time Ms. Richardson (hereinafter "the Mother") obtained full custody of the parties' minor child. At this time, Mr. Richardson (hereinafter "the Father") was ordered to pay child support at the rate of $85 per week. Due to the Father's failure to meet his support obligations over the past years, the Mother has filed three contempt actions prior to the filing of the instant one on August 12, 1996.

After this contempt action was brought, the Father filed three motions. First, he moved that the court order the Mother to elect whether she was proceeding under criminal or civil contempt. The Father's second motion involved a request that the court strike all pleadings in the Petition attempting to punish him pursuant to sections 29-9-102 and 29-9-103 of the Tennessee Code because there is a more specific statute for the purpose of punishing failure to pay child support. Finally, the Father moved the court to order the Mother to disqualify private counsel from prosecution of criminal contempt. The court

---

[1]Tenn. Code Ann. § 29-9-102 provides in pertinent part:
The power of the several courts to issue attachments, and inflict punishments for contempt of court, shall not be construed to extend to any except the following cases: . . . (3) The willful disobedience or resistance of any officer of the said courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of said courts. . . .
    Tenn. Code Ann. § 29-9-103 states as follows:
(a) The punishment for contempt may be by fine or by imprisonment, or both.
(b) Where not otherwise specially provided, the circuit, chancery, and appellate courts are limited to a fine of fifty dollars ($50,00), and imprisonment not exceeding ten (10) days, and, except as provided in § 29-9-108, all other courts are limited to a fine of ten dollars ($10.00).

granted only the first request, and in response, the Mother filed a notice on January 31, 1997 that she was proceeding under criminal contempt.

At trial, the Mother testified that during her marriage to the Father, he worked in various jobs involving construction work, landscaping, gutter cleaning and general labor. In an effort to locate the Father for purposes of collecting child support, the Mother testified that she distributed around certain areas of Nashville a "wanted" flyer with the Father's picture and her phone number on it. Three people contacted the Mother due to the flyer one of whom was Sue Dush, a witness at trial.

During the trial, Ms. Dush identified the Father as the man who had done a landscaping job for her in the summer of 1996 between June 15 and the end of June. Ms. Dush stated that she initially met and hired the Father when he stopped by her home in a "beat up light blue car" and offered landscaping services. She said that the Father had a beard. According to Ms. Dush, it was the Father who rendered a computer design for her yard, a copy of which was entered at trial as exhibit number three. Ms. Dush stated that the man she hired did a good job taking approximately two days working in the late afternoons. She said that she paid him $1700 cash which included $800 for labor. On cross-examination, Ms. Dush agreed that she had no documented proof as to where she got the $1700 but that it must have come from her credit union. She stated that the man had a brown truck in addition to his light blue car and that there was another man helping him. When the Father's attorney showed her photographs of two vehicles entered into evidence as exhibits six and seven, she denied having seen either of these.

David Courlas testified that he was a volunteer minister with Resolve Ministries Association which is a crises intervention group focussing on family counseling and marital rehabilitation. He stated that the Father had been referred to his organization by a church in June of 1995. Mr. Courlas brought to the court records of his interaction with the Father for the latter half of June of 1996. This document, which was entered as an exhibit, reflected that the Father along with his current wife, Linda Richardson, and son were at Mr. Courlas' home for a

Bible study from 6:00 p.m. until 10:00 p.m. on June 15, 1996. Mr. Courlas met again with the Father in the afternoon of June 17 from 1:30 until about 4:30 to discuss the Father's ongoing financial needs. Mr. Courlas' wife then took the Father to a gas station to put $10 worth of gas in his car. On the next day, June 18, Mr. Courlas was with the Father from 2:00 to 5:30. They met again on June 19 from 1:00 to 5:00 to discuss the Father's eligibility for Social Security benefits. On June 20, from 2:00 to 4:00, the Father and his wife Linda were in the Hickory Hollow Mall area at a nursing home as participants in a concert organized under Resolve Ministries during which Linda sang to the nursing home residents. On June 21, Mr. Courlas met with the Father again from 1:00 to 4:00 and they discussed the Father's needs for food and gasolene. Mr. Courlas did not see the Father over the weekend of June 23 and 24. However, on Monday June 24, Mr. Courlas was contacted by an ordained minister, Mr. Ashworth, regarding the Father's erratic behavior. They were concerned that the Father was not doing his part to receive support from the state in the form of food stamps, AFDC and Tenn Care. Mr. Courlas met the Father at Shoney's in Madison from 6:30 to 8:30 to discuss these matters. Again on June 25, the two met briefly at 1:00 in the afternoon. On June 27, there was another nursing home concert in the Green Hills area at which the Father and his wife Linda were present from 1:30 to 3:30. On June 28, the couple met from 11:30 to 3:30 with Mr. Courlas at his home where he counseled them on marital issues as well as their need to enroll in certain government programs.

Mr. Courlas assessed the Father's behavior during this time as "[v]ery jittery, very nervous, hard to keep his mind on anything and concentrate. . . . he believed that all state organizations, social security, the human services and everyone was conspiring against him. He had a difficulty, has to ask a question a hundred times, compulsive type behavior, does not accept what you tell him, you have to just keep on him to see any kind of real change." Mr. Courlas testified that the Father had a difficult time doing anything without his wife Linda there. Furthermore, it was Mr. Courlas' testimony that the Father did not have a computer on which he could have rendered a drawing such as the one entered into evidence as the blueprint for Ms. Dush's landscaping.

On cross-examination, Mr. Courlas testified that, during the time that Resolve Ministries was involved with the Father, he was not responsible for rent or mortgage as his home was provided by a relative. He stated that Resolve Ministries and other charity organizations provided the majority of food that the Father and his family needed during this time. The organization also frequently gave them clothing and referred them to other such providers. Mr. Courlas agreed that he only gave the Father a total of $15.00 for gasolene.

Mr. Courlas identified photographs of two cars as those of the Father. He testified that the sky blue Ford LTD in the picture entered as exhibit number seven was the one that the Father drove currently as well as in June of 1996. Mr. Courlas stated that the Father owned neither a brown truck nor a Roto-tiller. He asserted that he had been in the Father's home frequently and there was no room for such equipment. Mr. Courlas had seen the Father's equipment which consisted of a small trailer and a lawn mower. Even this equipment was sold after spring of 1996 in order to buy food for the family.

Mr. Courlas testified that at the time of trial in February of 1997, he had an ongoing relationship with the Father. He continued to see the Father many days during the week and they conversed by telephone on days when they did not meet. Regarding the June 27 nursing home concert, Mr. Courlas testified that the Father was in his blue car that day and that he remembered this because the Father helped load the equipment after the concert. Afterwards, they all went to Wendy's in the Green Hills area and Mr. Courlas bought dinner for them. Mr. Courlas testified that the Father's wife Linda was present with him at all of the meetings except for the June 24 meeting at Shoney's. Mr. Courlas said that he often had knowledge of the Father's whereabouts because the Father "is a chronic telephoner because he had a hard time dealing with things on a moment to moment basis." The phone logs of Resolve Ministries showed that the Father called an average of six times a day.

Melody Courlas, the wife of David Courlas, confirmed that she also met with the Father on June 15, June 17, June 18, June 19, June 21, June 27 and June 28 and that she was not present when her husband met with the Father for

counseling sessions at Shoney's. She stated that she had purchased food and gasolene for the Father many times several of which occurred between June 15 and June 20. She identified the light blue car in exhibit seven as the one which the Father was driving in June of 1996. She testified that the Father did not have a beard in June on 1996 nor had he ever had a beard in the two years since she had known him.

Richard Ashworth, who also served with Resolve Ministries, testified that he had been with Mr. Courlas several times during counseling sessions with the Father at Shoney's. Though he did not know specific dates, these sessions usually lasted two to three hours. They usually discussed financial matters. Mr. Ashworth testified that "quite a few times [he] bought [the Father] groceries and put gas in his car when they would be doing bad, which was pretty often." Mr. Ashworth testified that the Father's current wife does not work to his knowledge.

The Father's current wife, Linda Richardson, was called to the stand. She stated that she and the Father are the parents of one child whose name is Buddy. In June of 1996, Buddy was in day care in Donelson. As the Mother did not drive, it was the Father's responsibility to pick up the child. During the day, the Father would try to find money to pay the bills. She said that she never received $1700 from a landscaping job that he did. She said that she was basically with the Father from June 15 to June 30 except for sometimes he would meet with Mr. Courlas without her. She did not recall her husband going door to door seeking landscaping jobs. It was Ms. Linda Richardson's position that there was no way that her husband could have done a landscaping job without her knowing about it. She said that they did not own a brown truck or a Roto-tiller. When asked what bills had to be paid, the Mother mentioned an electric bill, a water bill and a phone bill. In addition, there was the cost of food in June of 1996 because they were not getting food stamps at that time. She testified that they got clothing from churches. She said that her father paid the $800 per month for child care. Linda Richardson testified that, during June of 1996, her husband got almost all of the money to pay for the bills from Mr. Courlas. She confirmed that she had sung once or twice at nursing homes recalling specifically the two nursing homes that Mr. Courlas had mentioned in his testimony. She

said that the reason that her child Buddy stays in a day care is that she and her husband both have mental illnesses.

The parties stipulated the testimony of Sherry Hesson, the owner of the child's day care, that the Father picked up the child between 5:30 and 6:00 p.m. from June 15 to June 30, 1996. Ms. Hesson's testimony was that the Father was driving a light blue Ford and that he had no beard when he picked up the child during these dates.

Following a bench trial, the trial court found the Father had the ability to pay child support but did not and therefore was guilty of at least nine counts of willful contempt pursuant to section 29-9-101 of the Tennessee Code. The court further found the Father's payments to be in arrears in the amount of $14,110.90 on the previous judgment plus $4,083 in additional child support for a total of $18,194.58. The court sentenced the Father to ten days of jail per violation for a total of ninety days. Based on Sue Dush's positive identification of the Father as the man to whom she paid $1700 for a landscaping job, the court found that the Father was "able to produce income separate and apart from his SSI benefits." In addition, the court made the following statement:

> [E]ven from the testimony of the [Father's] alibi witnesses, the [Father's] time was not totally accounted for and the [Father] could have performed the work as testified by the [Mother's] witness.

The court granted the Father's motion to stay his ninety-day sentence pending appeal but ordered that the child support obligations remain in effect.

On appeal, the Father has raised several issues. Primarily, he insists that criminal contempts carrying any penalty of confinement require that a defendant be given the rights of any criminal defendant including a jury trial. Further, the Father claims that he was denied the fundamental constitutional right to an independent unbiased prosecution because the prosecuting attorney in this case was hired by a private law firm through a contract with the state. The Father also contends that the trial court erred in using the general contempt statutes of sections 29-9-102 and 29-9-103 of the Tennessee Code to impose contempt

sanctions when there exist specific statutes for the purpose of punishing a failure to pay child support such as Tennessee Code Annotated section 36-5-104(a) and section 39-15-101. Finally, the Father asserts that the court erred in sentencing him to consecutive sentences.

The Father's first issue of whether or not he should have been granted a jury trial on his criminal contempt charges is based upon the Supreme Court cases of ***Bloom v. Illinois***, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968) and ***International Union, United Mine Workers v. Bagwell***, 512 U.S. 821, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994). In ***Bloom***, the Court held that prosecutions for serious criminal contempt are subject to the jury trial provisions of Article III, § 2 of the United States Constitution[2] and the Sixth Amendment[3] applied to the states through the due process provisions of the Fourteenth Amendment. Petty contempts, on the other hand, need not be tried by a jury. ***Bloom***, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522. Courts "are to look to the penalty actually imposed as the best evidence of the seriousness of the offense." ***Id.*** 391 U.S. at 211, 88 S.Ct. at 1487, 20 L.Ed.2d at 534. The court "need not settle 'the exact location of the line between petty offenses and serious crimes,'" however a crime punishable by imprisonment of two years is a serious offense. ***Id.*** (quoting ***Duncan v. Louisiana***, 391 U.S. 145, 161, 88 S. Ct. 1444, 1454, 20 L.Ed.2d 491, 503 (1968)). Subsequently in ***Bagwell***, the Court asserted that more than six months imprisonment would be a serious criminal contempt warranting a jury trial. ***Bagwell***, 512 U.S. at 826-27, 114 S.Ct. at 2557 (citing ***Bloom***, 391 U.S. at 199, 88 S.Ct. at 1481 and ***Taylor v. Hayes***, 418 U.S. 488, 495, 94 S.Ct. 2697, 2701-02, 41 L.Ed.2d 897 (1974)).

The Tennessee Supreme Court has established that our state constitution's right to jury trial is even broader than the federal right. In ***State v. Dusina***, 764 S.W.2d 766 (Tenn. 1989), the court interpreted the term "small offense" as used in Tennessee Rule of Criminal Procedure 23 which provides in

---

[2]"The Trial of all Crimes, except in Cases of Impeachment shall be by Jury . . . " U.S. Const. art. III, § 2.

[3]"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . " U.S. Const. amend. VI.

pertinent part that "[i]n all criminal cases except *small offenses*, trial shall be by jury." (emphasis added). The court overruled the lower court's adoption of the federal definition for small offense which included a jail sentence of six months or less. *Id.* at 768 (citing *Bloom*, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522). The court noted that "the term 'small offense' has traditionally been defined in Tennessee as one in which the punishment cannot exceed a fine of $50.00 and which carries no confinement in a jail or workhouse." *Id.* at 768. Stating that "Article I, Section 6 of the Constitution of Tennessee preserves the right of trial by jury as that right existed at common law," the court asserted that "[f]or violation of general criminal statutes, however, where a fine of more than $50.00 or any confinement of the accused may be imposed, the right to jury trial under the Tennessee constitution is well-established." *Id.*

In *Brown v. Latham*, 914 S.W.2d 887 (Tenn. 1996), the court held that a defendant charged with violating section 36-5-104(a) of the Tennessee Code[4] for the failure to comply with a child support order was entitled to a jury trial under the reasoning of *Dusina*. The court determined that section 36-5-104(a) at issue in *Brown* defines a criminal offense. *Id.* at 888. The court then compared that statute to the statutes at issue in this case, sections 29-9-102 and 29-9-103 of the Code, indicating that these latter parts of the code are not criminal offenses for which defendants are entitled to jury trials. *Id.* at 888-89.

> Section 36-5-104(a) . . . states the essential indicia of a criminal offense. Its violation is not declared to be a contempt as contemplated by Tenn. Code Ann. § 29-9-102 (1980). Its stated purpose is not to compel performance but to punish for non-performance by imprisonment for a definite period of time. The language of subsection (b), "[n]o arrest warrant shall issue" under certain conditions, indicates a criminal proceeding. The penalty imposed, imprisonment for a period of time not to exceed six months, conforms with the definition of a misdemeanor stated in Tenn. Code Ann. § 39-11-110 (1991), which provides, "... all violations of law punishable by fine or confinement for less than one (1) year,

---

[4]This statute provides as follows:
(a) Any person, ordered to provide support and maintenance for a minor child or children, who fails to comply with the order or decree, may, in the discretion of the court, be punished by imprisonment in the county workhouse or county jail for a period not to exceed six (6) months.

or both, are denominated misdemeanors." The punishment authorized far exceeds the $50 fine and ten days imprisonment provided in Tenn. Code Ann. §§ 29-9-102, 103, which are the sanctions traditionally utilized to vindicate the authority of the courts.

*Id.* at 888. Indeed, based upon the distinction drawn in **Brown**, the Court of Appeals has, in an unpublished opinion, refused to extend the right of a jury trial to a charge of criminal contempt under Tennessee Code Annotated section 29-9-103. **Perkerson v. Perkerson**, No. 01A-01-9602-CV-00059, 1996 WL 426807 (Tenn. Ct. App. 1996). This court held that a statute imposing a fifty dollar fine or ten days in jail does not entitle the accused to a jury trial.

In the case before us, the court found that the Father was guilty of willful criminal contempt pursuant to section 29-9-101 because he "had the ability to pay, but did not do so." Based upon the cases of **Brown** and **Perkerson**, we find that a contempt charge under section 29-9-101 does not entitle a defendant to a jury trial.[5] The court's language indicated that it found that the Father had the financial ability to pay these funds but that he had refused to do so. The problem here lies not in the court's denial of a jury trial for a finding of contempt under section 29-9-101 but rather in the fact that there was no proof that the Father had the financial ability to pay. The Mother did attempt to show that the Father had the ability to produce income; however, as shown in the remainder of this opinion, she failed to establish this.

Thus, we turn to a review of the issue of the sufficiency of the evidence. The burden of proof rests with the State of Tennessee to show beyond a reasonable doubt that the Father is guilty of criminal contempt. **Black v. Blount**, 938 S.W.2d 394, 398 (Tenn. 1996); *see also International Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 826, 114 S.Ct. 2552, 2557, 120 L.Ed.2d 642 (1994). As stated, the lower court found the Father had the ability to pay child support but did not and therefore was guilty of at least nine counts of willful contempt. After a careful review of the record, and adherence to Rule

---

[5]The Father was sentenced to nine counts of contempt for an aggregate jail sentence of ninety days. As this matter can be resolved on the lack of sufficient evidence, we leave for another day the issue of whether there is a point at which an aggregate sentence under section 29-9-101 might become lengthy enough to merit a trial by jury.

13(d), Tenn. R. App. P., we disagree and conclude that the State has failed to meet its burden to show that the Father had the financial ability to comply with the child support order.

In his opening statement, the Mother's attorney conceded that the Father was disabled and that he received social security benefits. It was clear that the Mother was not arguing that child support could be assessed against this social security money; rather, it was the Mother's position that the Father was capable of engaging in other work and indeed that he had done so. The record reveals that the only testimony with regard to the Father's ability to produce income is that from Sue Dush. As stated, Ms. Dush claimed that she paid the Father $1700 in cash for a landscaping job which took approximately two days during the period between June 15 and the end of June in 1996. Based upon this limited exposure, Ms. Dush made an in-court identification of the Father stating that he, in June of 1996, had a beard.

Ms. Dush's testimony was not confirmed in any way by the rest of the proof. In fact, other evidence contradicted it. For instance, Ms. Courlas stated that the Father did not have a beard in June of 1996. This was corroborated by the stipulated testimony of Sherry Hesson, the owner of the day care where the Father's child stayed. In addition, Ms. Dush did not recognize either of the photographed vehicles in exhibits six and seven as those used by the man who landscaped her yard while both Mr. and Ms. Courlas claimed that these vehicles were the only ones that the Father owned in June of 1996. Moreover, Mr. Courlas said that, in June of 1996, the Father did not have a computer capable of producing the design that was given Ms. Dush nor did he have the appropriate equipment for the actual landscaping work which was done in Ms. Dush's yard. Though Mr. Courlas spent significant time with the Father in the latter half of June of 1996, he was not aware that the Father worked for Ms. Dush. Finally, Ms. Linda Richardson stated that there was no way that her husband could have done a landscaping job without her knowing about it.

Further, there was evidence that the Father was incapable of such work. As stated, Mr. Courlas found the Father to be jittery and nervous. He said that

he had a difficult time concentrating and that he had to ask questions "a hundred times, compulsive type behavior." Mr. Courlas also testified that the Father "had a hard time dealing with things on a moment to moment basis." In addition, he said that the Father had a difficult time doing anything without his wife Linda present. It was Linda Richardson's testimony that both she and the Father suffered from mental illnesses.

Finally, there was no proof that the Father had in his possession sufficient funds to pay the judgment against him. In fact, the evidence was that the Father had very little money. Mr. Courlas testified that the Father was not responsible for rent or mortgage as his home was provided by a relative. Mr. Courlas stated that Resolve Ministries and other charity organizations provided the majority of food that the Father and his family needed during the time that the Father was involved with Resolve. The Father's wife Linda confirmed that churches gave clothing to her family and that, at least for June of 1996, Resolve Ministries gave them money to pay their bills. Linda testified that the $800 per month cost of child care for the Father's and her child was paid for by her own father.

In conclusion, we find that there remains a substantial and reasonable doubt that the Father was able to earn enough income or that he was in possession of sufficient funds to meet his support obligations. Thus, we find that there was insufficient evidence to conclude that the Father was guilty of criminal contempt. Based upon this decision, we do not reach the remaining issues raised by the Father. The lower court's decision to hold the Father guilty of nine counts of contempt under Tennessee Code Annotated section 29-9-101 is reversed, and this cause is remanded to the trial court for further proceedings in accordance herewith.

_____

WALTER W. BUSSART, SPECIAL JUDGE


CONCUR:


_____
HENRY F. TODD, PRESIDING JUDGE, M.S.


_____
BEN H. CANTRELL, JUDGE