**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                     No. 94-5893

CASSIUS HAWKINS,
Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of West Virginia, at Elkins.
Robert E. Maxwell, District Judge.
(MISC-94-5-W)

Argued: June 9, 1995

Decided: February 15, 1996

Before RUSSELL and MURNAGHAN, Circuit Judges, and
FABER, United States District Judge for the Southern District of
West Virginia sitting by designation.

_____

Vacated and remanded by published per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Christopher P. Riley, BAILEY, RILEY, BUCH & HAR-
MAN, L.C., Wheeling, West Virginia, for Appellant. Paul Thomas
Camilletti, Assistant United States Attorney, Wheeling, West Vir-
ginia, for Appellee. **ON BRIEF:** Alan G. McGonigal, BAILEY,
RILEY, BUCH & HARMAN, L.C., Wheeling, West Virginia, for
Appellant. William D. Wilmoth, United States Attorney, Wheeling,
West Virginia, for Appellee.

**OPINION**

PER CURIAM:

Cassius Hawkins appeals his conviction for criminal contempt. Finding that the trial court committed reversible error, we vacate the judgment of conviction and remand for a new trial.

I

Hawkins was indicted in the Northern District of West Virginia for narcotics offenses involving cocaine. After pleading guilty pursuant to a plea agreement, he was sentenced by Chief Judge Frederick P. Stamp, Jr. to sixteen years imprisonment. Hawkins' plea agreement obligated him to answer all inquiries made of him and to give sworn statements and grand jury and trial testimony relative thereto. On November 18, 1993, Hawkins was called as a witness in the trial before Chief Judge Stamp of his former associate, Rico McGhee. On the witness stand, Hawkins quickly became uncooperative and defiant. The following colloquy then took place.[1]

> THE COURT: Mr. Hawkins, let me pause a moment and give a little bit of advice?
>
> THE WITNESS: You can't give me no advice. I got 16 years. You can't give me anything.
>
> THE COURT: Your job is to answer the question.
>
> THE WITNESS: My job is not supposed to be here.
>
> THE COURT: And you will not ask the questions of the Government attorneys or of the defense attorneys who may seek to introduce you.

_____

[1] Hawkins used some of the crudest and most insulting epithets in the English language toward Judge Stamp. These have been omitted from the quotations in this opinion, but appear in unexpurgated form in the trial transcript.

THE WITNESS: I am a Six Deuce Crypt. I can say anything I want. You can't tell me something. You gave me 16 years. You send me back to the pen.

THE COURT: I think this is a time we will take a break in the afternoon. . . .

After a brief recess, the trial continued as follows in the absence of the jury:

THE COURT: All right, Mr. Hawkins, I would again caution you and tell you that your refusal to answer questions that you are being evasive in answering questions, or you are answering questions by asking questions is inappropriate and is not the way to serve as a trial witness in this court. If you continue to serve as a recalcitrant witness, then I will have no other choice but to cite you for civil contempt of court, in which case and at which time you will be remanded to the custody and held in civil contempt. You may at any time during the trial of this case get rid of any civil contempt charge that I may cite you to by agreeing to testify properly. In the event that you do not purge yourself with civil contempt should it be cited upon you, then you may, under the rules, be held in criminal contempt. And that would be another charge of a criminal nature for which you may be punished by a fine or by a commitment for criminal contempt. Do you understand that, sir?

THE WITNESS: Yeah, I understand it.

THE COURT: Now, are you willing to abide by the rules? And we will bring the jury back down and will you-- are you willing to answer the questions that are asked of you and to not ask questions? You understand that this is not your role to ask questions, but to answer the questions. We need you as a witness here. And we need you to testify truthfully and to listen to the questions and then to answer them.

3

THE WITNESS: But, look, I never asked to be here. I didn't want to be here. I'm not going to help you all do nothing against my boy. I'm not going to help you all. You might as well kick me out now and let me go on back and take me on back to the penitentiary.

THE COURT: All right, are you going to answer questions that are asked of you?

THE WITNESS: Answer questions? I just told you I'm not going to help you all. I can't help you all.

THE COURT: Well, you are not going to help me one way or the other.

THE WITNESS: I won't then.

THE COURT: I want to conduct the trial, and I want you to answer the questions that are asked. Are you willing to answer the questions?

THE WITNESS: You are failing to understand me. I am not going to answer no questions. I didn't ask to be here. Nobody told me I am supposed to be here. I am not going to answer no questions.

THE COURT: I will direct you to answer the questions that are put to you.

THE WITNESS: Then I am going to plead the Fifth.

THE COURT: All right. You may tell me now exactly what reasons you may give me for pleading the Fifth Amendment.

THE WITNESS: Because I don't want to answer no questions against my boy. I don't want to be here. I didn't sign no plea bargain to be here.

4

THE COURT: What is the government's position with regard to the assertion of the Fifth Amendment?

MR. CAMILLETTI: Your Honor, in signing his plea agreement, the defendant has waived his Fifth Amendment rights by agreement dated December 10, 1991, and signed by the defendant on December 12, 1991. He has agreed to be completely forthright and truthful with federal officials in this district, answer all inquiries made of him, give sworn statements, grand jury and trial testimony relative thereto.

THE COURT: All right, by virtue of the conditions of your plea agreement, I believe that you would be required, Mr. Hawkins, to answer the questions that are put to you.

THE WITNESS: So, what you are all saying, you are going to give me 16 years of my life taken away, and then you going to want me to help you all to do something against somebody else. Is that what you're saying? Man, [expletive] this. I'm through with this. Take me on back to the cell of mine.

THE COURT: That is exactly what we will do.

THE WITNESS: You will not do [expletive] to me. You will not do [expletive] to me.

THE COURT: I will cite you for civil contempt--

THE WITNESS: You just cite me for anything you want. Just add it on -- put it on the 2005 date I already got.

THE COURT: I will cite you for civil contempt, and if you wish to have an attorney to advise you --

THE WITNESS: [expletive] you.

THE COURT: -- during this time, that may be done, and you may purge yourself of civil contempt at any time before

5

the end of trial. If you do not do so, a charge of criminal contempt will be placed on you.

THE WITNESS: Do what you got to do.

(App. at 60-64.)

At the direction of Chief Judge Stamp, the clerk's office contacted a Criminal Justice Act panel attorney and arranged for him to represent Hawkins. The next day, November 19, 1993, upon the advice of counsel, Hawkins indicated he was ready to give truthful and complete answers. While the transcript of Hawkins' ensuing testimony reflects that he was less than completely cooperative, Chief Judge Stamp did not hold him in further civil or criminal contempt and imposed no additional punishment.

On January 25, 1994, the United States filed a Petition for Criminal Contempt, pursuant to Rule 42(b) of the Federal Rules of Criminal Procedure. In this petition, the government moved for an order requiring Hawkins to appear and show cause why he should not be held in contempt and punished for his earlier misbehavior in the presence of the court. The petition charged that Hawkins' misbehavior obstructed the administration of justice as prohibited by 18 U.S.C. § 401(1). The matter was assigned to Judge Robert E. Maxwell, who had not been present at the McGhee trial.[2] Judge Maxwell ordered a transcript of relevant portions of the McGhee trial, appointed counsel for Hawkins, and scheduled a hearing upon the government's petition.

At the hearing, held on October 18, 1994, Hawkins was represented by counsel who raised three points in his defense. First, counsel argued that the fact that Chief Judge Stamp had not held Hawkins in contempt was an implicit ruling precluding the government from proceeding further with the contempt case. Second, he contended that Hawkins was entitled to a jury trial upon the contempt charges since he was subjected to imprisonment in excess of six months. Lastly, he

_____

**2** Judge Maxwell assumed responsibility for the case because of the following provision in Rule 42(b): "If the contempt charged involves disrespect or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent."

insisted that the government had the burden of proving by competent evidence that the person appearing before Judge Maxwell was in fact the same individual who had insulted Chief Judge Stamp.

Judge Maxwell rejected Hawkins' first argument, reasoning that, since the case had been instituted upon the motion of the United States pursuant to Rule 42(b) and Chief Judge Stamp was, by the express terms of this rule, disqualified from deciding it, it was open to Judge Maxwell to treat it as a new prosecution. Secondly, he ruled that Hawkins was not entitled to a jury trial. Judge Maxwell recognized that a jury trial was formerly required for an offense involving more than six months imprisonment, and reasoned that this rule had been changed by the Sentencing Guidelines and the express language of Rule 42(b) which requires a jury trial only "in any case in which an act of Congress so provides."

On the final issue -- the defendant's identity-- Judge Maxwell relied upon the unsworn assertion of Assistant United States Attorney Camilletti, counsel for the government at the October 18, 1994 hearing, that Hawkins was the same person who had made the obscene and recalcitrant statements before Chief Judge Stamp. On this point, the following colloquy took place before Judge Maxwell:

> THE COURT: Were you in the McGhee trial?
>
> MR. CAMILLETTI: I was, your Honor.
>
> THE COURT: And is this the individual who was on the witness stand and made the statements that are reflected in the transcript?
>
> MR. CAMILLETTI: Yes, your Honor.
>
> THE COURT: And does the defendant deny that?
>
> MR. RILEY: Your Honor, as defense counsel, I have instructed the defendant to remain silent as to that.

(App. at 49-50.)

7

Acting without a jury, Judge Maxwell proceeded, on the basis of the McGhee trial transcript and the unsworn statement of Assistant United States Attorney Camilletti, to find Hawkins guilty of criminal contempt, and sentenced him to both a one-year term of imprisonment and a $2,000 fine.

II

We believe the trial court erred when, reasoning that Rule 42(b) requires a jury trial only when an act of Congress requires, it denied Hawkins' demand for a jury. The trial court's rationale ignores a defendant's constitutional right to a jury trial in cases involving more than petty offenses. The Supreme Court considered this issue in Bloom v. Illinois, 391 U.S. 194 (1968), and held that, since serious criminal contempts are quite similar to other serious crimes, they are subject to the Constitution's jury trial provisions. The Supreme Court explained: "If the right to jury trial is a fundamental matter in other criminal cases, which we think it is, it must also be extended to criminal contempt cases. . . . [W]hen serious punishment for contempt is contemplated, rejecting a demand for jury trial cannot be squared with the Constitution. . . ." Id. at 208. Only petty criminal contempts, said the Court, may be tried without honoring the defendant's demand for a jury.

Shortly after the decision in Bloom, the Supreme Court addressed the distinction between serious offenses, which carry a constitutional right to trial by jury under the Sixth Amendment, and petty offenses, which do not. In that case, Frank v. United States, 395 U.S. 147 (1968), the Court held that the "most relevant indication of the seriousness of the offense is the severity of the penalty authorized for its commission." Id. at 148. Recognizing that Congress has placed no specific limits on the penalties which may be imposed in cases of criminal contempt, the Court ruled that, in such cases, the "severity of the penalty actually imposed is the best indication of the seriousness of the offense." Id. at 149.

By sentencing Hawkins to one year in prison, the trial court implicitly held, under the rule of the Frank case, that the contempt charged constituted a serious offense. Accordingly, Hawkins was entitled to have his demand for a jury trial honored. This right exists under the

8

Sixth Amendment to the United States Constitution, regardless of the fact that Rule 42(b) requires a jury trial only when an act of Congress specifies.

The trial court also erred in sentencing Hawkins to both a fine and imprisonment. The contempt statute, 18 U.S.C. § 401, provides that federal courts shall have the power to punish contempt by a fine or imprisonment. As the court indicated in United States v. Holloway, 991 F.2d 370, 373 (7th Cir. 1993), the disjunctive language of 18 U.S.C. § 401 precludes both imprisonment and a fine for a single offense. See also, United States v. White, 980 F.2d 1400, 1401 (11th Cir. 1993) (Sentencing Guidelines do not permit both a fine and imprisonment for criminal contempt).

III

The United States now concedes that Hawkins was entitled to a jury trial for a serious contempt and that he could not be punished by both a fine and imprisonment. Rather than remand this matter for a new trial, however, the United States urges us to modify the sentence so that a jury trial would not have been required and the disjunctive language of § 401 precluding both a fine and imprisonment would not have been violated. This course of action has been held to be proper in an appropriate case. In Taylor v. Harper, 418 U.S. 488 (1974), a Kentucky trial court had imposed sentences for eight separate contempts totaling almost four and one-half years imprisonment without according defendant a jury trial. The Kentucky Court of Appeals reversed on other grounds, but indicated it was not improper for the court of appeals itself to have corrected the sentence so that a jury trial was not required. Changing the sentences to run concurrently, as the appellate court did in Taylor, was approved by the Supreme Court as an acceptable alternative to remand. See also , Green v. United States, 356 U.S. 165, 188 (1958); United States v. Powers, 629 F.2d 619, 624 (9th Cir. 1980).

However, this authority to correct trial court errors in contempt cases by modifying the sentences imposed is limited to situations in which the sentences have been lawfully imposed but for their severity. This is not such a case. In this case, no contempt sentence of any kind could lawfully have been imposed because the government

failed to prove the identity of the defendant by competent evidence beyond a reasonable doubt. See Buffington v. Baltimore County, 913 F.2d 113, 135 (4th Cir. 1990), cert. denied, 499 U.S. 906 (1991) (a finding of criminal contempt must be based upon proof beyond a reasonable doubt).

Since this was a proceeding under Rule 42(b) before a judge who had not personally witnessed the contempt in question, Judge Maxwell was required to find that the elements of criminal contempt had been established by the evidence at the hearing before him.

The evidence against Hawkins at the Rule 42(b) hearing consisted of the Assistant United States Attorney's identification of Hawkins as the same person who had been recalcitrant and had uttered obscenities before Chief Judge Stamp and a copy of the transcript from the trial before Chief Judge Stamp. The identity of Hawkins, which is an element of the crime of contempt, was shown solely by unsworn testimony. Hawkins' counsel objected that identity had not been proven, and contended the Assistant United States Attorney's unsworn statement should not have been considered.[3]

Rule 603 of the Federal Rules of Evidence provides that "[b]efore testifying, every witness shall be required to declare that the witness will testify truthfully . . . ." Thus, testimony taken from a witness who has not given an oath or affirmation to testify truthfully is inadmissible. Fed. R. Evid. 603. Admission of inadmissible testimony over a party's objection is an abuse of discretion, recognized on appeal as

_____

[3] One ground for defendant's objection to AUSA Camilletti's identification of Hawkins was the prohibition against an attorney testifying in a case in which he represents one of the parties. However, Hawkins also objected to the absence of competent evidence on the identification issue asserting that "it is the Government's burden to prove that the gentleman sitting here at defense table is in fact the gentleman who was present in the courtroom before Judge Stamp." (App. at 48.) Counsel argued that for the government to meet this burden, an adversarial hearing would be required. Thus, the objection was specific enough to preserve the point for appeal since it alerted the trial court to the necessity that defendant's identity be proven by the government in an adversarial context, implying the right to confront and cross-examine the witness.

10

error. See United States v. Odom, 736 F.2d 104, 116 (4th Cir. 1984) (holding that right to object on appeal to the failure to swear witnesses is waived when the objecting party voluntarily and knowingly refused at trial to object). As counsel for defendant did object at trial to the court's reliance on Camilletti's unsworn testimony, admission of the identification testimony was in error.

The government argues that the error in admitting the identification testimony was harmless, because even without the identification testimony, identity could have been established by judicial notice (a) that proceedings before the court had proceeded in a regular manner, and (b) that in the course of regular proceedings, the proper incarcerated defendant generally is brought before the court. However, judicial notice of Hawkins' identity or of the regularity of the proceedings was, in fact, neither requested by the government, [4] nor taken sua sponte by Judge Maxwell. See United States v. James, 987 F.2d 648, 651 (9th Cir. 1993) (overturning robbery conviction on grounds of insufficient evidence, and refusing to find harmless the government's failure to prove one element of the crime, where judicial notice of the existence of the unproven element was not requested or taken at trial). In United States v. Burroughs, 564 F.2d 1111, 1116 n.7 (4th Cir. 1977), overruled in part on other grounds, United States v. Steed, 674 F.2d 284, 285 n.2 (4th Cir.) (en banc), cert. denied, 459 U.S. 829 (1982), we affirmed the entry of a judgment of acquittal, finding that a federal nexus was an element of the crime and no evidence of a federal nexus was introduced at trial. In so holding, we reasoned that "we will not take judicial notice on appeal of an unproven essential ele-

_____

[4] The government did ask Judge Maxwell to "presume" that Hawkins was the same person who had appeared before Judge Stamp, but on grounds that chain of custody should be presumed intact, not on grounds of judicial notice. However, chain of custody principles, codified in Rule 901 of the Federal Rules of Evidence as "authentication or identification," are generally relevant only to physical evidence. Even if a person's identity was susceptible to proof by a chain of custody, the condition precedent to the admissibility of such an identification, that "evidence sufficient to support a finding that the matter in question is what its proponent claims" must be produced, was not met in the instant case. Fed. R. Evid. 901. No competent evidence was produced at the Rule 42(b) hearing to establish that the chain of custody was intact.

11

ment of a criminal offense." Id. at 1116 n.7; see also, Glover v. Cole, 762 F.2d 1197, 1200 n.6 (4th Cir. 1985) ("Judicial notice is an inappropriate device for remedying a failure of proof.").

Moreover, we believe that the identity of a defendant may not be proven by judicial notice in the manner proposed by the government. According to the Federal Rules of Evidence, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Clearly, Hawkins' identity is not a fact generally known in West Virginia, nor is it capable of determination by resort to sources whose accuracy cannot reasonably be questioned.

Identity is an element of every criminal offense, and one that is frequently and quite reasonably disputed. The unsworn statement of government counsel in this case does not eliminate reasonable dispute. See United States v. Wilson, 631 F.2d 118, 120 (9th Cir. 1980) (overturning, on grounds of insufficient evidence, a conviction for bail-jumping, and holding that the district court could not take judicial notice that the defendant had been out of custody for seven days as claimed by the prosecutor in an unsworn statement). If judicial notice that proceedings had been regular and that regular proceedings generally bring the correct defendant to the court were sufficient to establish identity, the government would no longer have to prove the identity of defendants, and an innocent defendant could conceivably be convicted of crimes committed by another. Cf. In re Mundorff, 8 F.R.D. 7, 8 (D. Or. 1948) ("The Clerk cannot take judicial notice of [the identity of a defendant's] signature. If a defendant comes into court here, his identity can be either admitted by him or proven. But [one] cannot know that some one is not masquerading as a defendant in order to save the real culprit."). Accordingly, the erroneous admission of government counsel's unsworn identification testimony was not harmless.

IV

Hawkins raises two other points on this appeal which deserve comment. First, he contends that the court erred when it failed to give him

12

any notice of the adjudication hearing as required by Rule 42(b) of the Federal Rules of Criminal Procedure and the Fifth Amendment to the United States Constitution. This issue was not raised below and, therefore, was not preserved for appeal unless it constitutes plain error. Furthermore, a review of the facts of this case indicate that Hawkins did receive actual notice of the hearing and was not prejudiced or surprised thereby. The record demonstrates that the defendant had ample actual notice of the sanctions sought by the United States in time to prepare a defense. The court caused service of the petition for criminal contempt, the government's memorandum in support thereof, and a transcript of the proceedings where the alleged contempt occurred to be served upon the defendant, and the defendant was sufficiently apprised to be able to file his own memorandum in opposition thereto. Thus, Hawkins had ample notice of these proceedings and plenty of time to prepare his defense which was, in fact, ably presented by counsel at the hearing before Judge Maxwell.

Lastly, Hawkins contends that since Chief Judge Stamp represented to him, on November 18, 1993, that he would be held in criminal contempt unless he purged the civil contempt and because the civil contempt was, in fact, purged, the government is estopped from filing a criminal petition against the defendant. Chief Judge Stamp's direction to Hawkins concerning his purging of contempt is susceptible to the interpretation placed upon it by Hawkins. It is also, however, susceptible to the contrary interpretation that Chief Judge Stamp was referring only to the contempt Hawkins committed by his refusal to testify. If this latter interpretation is the correct one, the separate contempt Hawkins engaged in by using obscene and disrespectful language to the judge was not purged by his subsequent trial testimony. The record does not contain any testimony, affidavit or other directive from Chief Judge Stamp setting forth specifically what he had intended in this regard.

Upon remand, Chief Judge Stamp should be given the opportunity to clarify this point so that this issue may be presented to the trial court for a proper ruling. Since the record is ambiguous, Chief Judge Stamp can explain, by testimony, deposition, or other method consistent with the rules, whether he intended to offer Hawkins the opportunity to purge his contempt for both a refusal to testify and the use of foul language or only for the former.

13

Having found that the trial court committed reversible error, we are of the opinion that, rather than simply reverse Hawkins' contempt conviction, the conviction should be vacated and the matter remanded for further proceedings, including a new trial. The appellant specifically requested such relief in the alternative on appeal and it is clear that the court has the power to direct a new trial in the interest of justice even when the accused seeks an acquittal. See, 3 Wright, Federal Practice & Procedure, § 599 at 369 (1982); United States v. Reed, 647 F.2d 678, 687 (6th Cir. 1981). Likewise, the prohibition of the Double Jeopardy Clause against successive prosecutions does not preclude retrial of a defendant whose original conviction is set aside because of some error in the proceedings leading to conviction. Lockhart v. Nelson, 488 U.S. 33, 38 (1988); United States v. Ball, 163 U.S. 662 (1896).

On remand, the trial court should endeavor to ascertain the true intention of Chief Judge Stamp when he instructed Hawkins that he could purge himself of contempt and should then rule upon the issue of whether Chief Judge Stamp's actions preclude further prosecution.[5] If the trial court determines that further prosecution is proper, it may, at its option, give Hawkins a jury trial or, in the alternative, revisit its decision that this is a serious offense and limit the potential punishment accordingly.

VACATED AND REMANDED

_____

[5] It is not clear from the record whether Judge Stamp played any role in initiation of the contempt charges against Hawkins. Those charges were commenced by the United States Attorney filing a petition; whether he did so on his own motion or at Judge Stamp's request is not revealed. In the event that Judge Stamp for some reason declined to take further action against Hawkins, the trial court should consider that fact as well in its determination of whether Judge Stamp's actions preclude further prosecution.

14