■ CITY OF NEW YORK, Respondent, v RICHARD J. VIZZINI, Individually and as President, of the Uniformed Firefighters Association of Greater New York, Local 94, et al., Appellants.—Judgment, Supreme Court, New York

County, entered February 27, 1974, adjudging the Uniformed Firefighters Association in contempt and assessing a fine of $650,000, modified, on the law and in the exercise of discretion, to the extent of reducing the fine to $400,000 and otherwise affirmed, without costs or disbursements. The Uniformed Firefighters Association, the collective bargaining agent for the uniformed fire fighters in New York City, called a strike which began on November 6, 1973 at 8:30 A.M. and lasted five and one-half hours. During that period 338 alarms were sounded and 80 actual fires broke out. Response to these alarms was attended by a skeleton force of firemen. Noteworthy also is the fact that there were 187 false alarms that day, when a comparable day under nonstrike conditions would result in a total of approximately 45 alarms. The strike was called despite an outstanding temporary restraining order. The parties had stipulated at Special Term that the union was guilty of contempt of the temporary restraining order of Justice Greenfield and its extension by Justice Fine. Therefore, the finding of contempt by Special Term is not the subject of review but, rather, the amount of the fine imposed as a punishment for that contempt. Section 751 (subd 2, par [a]) of the Judiciary Law, as amended, sets forth guidelines to be considered by the court in fixing the amount of the fine, which include: "(i) the extent of the wilful defiance of or resistance to the court's mandate (ii) the impact of the strike on the public health, safety, and welfare of the community and (iii) the ability of the employee organization to pay the fine imposed; and the court may consider (i) the refusal of the employee organization or the appropriate public employer, * * * or the representatives thereof, to submit to the mediation and fact-finding procedures * * * and (ii) whether, if so alleged by the employee organization, the appropriate public employer or its representatives engaged in such acts of extreme provocation as to detract from the responsibility of the employee organization for the strike." The firemen's contract with the city expired on June 30, 1973. In May, 1973 the union issued a list of its demands. During 10 meetings over a six-month period, the city made no counteroffers. By the end of October, 1973 the union had pared its demands substantially and the city still had made no offer. A strike was threatened. A temporary restraining order was signed by Justice Greenfield on November 2, 1973 and returnable on November 5, 1973. In the early morning hours of November 5, the city made its first offer which was rejected by the union. On November 5, Judge Fine adjourned the motion to November 8 for continuation of negotiations but conditioned upon continuation of the terms of the temporary restraining order. The collective bargainers reached an agreement which was overruled by the Deputy Mayor. The union then began the strike which, as noted previously, took place on November 6 and was but of a few hours' duration. A hearing on the financial ability of the union and its defense of extreme provocation took place on January 14, 1974. While concededly the union obtains income from dues checkoff, it also has relatively large monthly expenses. Special Term held that the provocation of the city was not so extreme as to justify violation of the outstanding court orders, especially in view of the obvious danger to the health and safety of the citizenry. The impact of article 14 of the Civil Service Law (popularly known as the Taylor Law) imposes responsibilities on public employers as well as employees. However, in view of the prohibition against striking, a concomitant obligation on the part of the employer to bargain in good faith must also be recognized. We find that the city failed to make constructive offers of settlement until the eleventh hour of negotiations. We nonetheless agree with Special Term that the provocation was not so extreme as to warrant a

strike in view of the disastrous impact such a strike would have on the well-being of the population of the city. We also note the very short duration of the strike, as well as the relatively weak financial state of the union. In consideration of all these factors, we have modified the fine imposed to the extent indicated. Concur—Murphy and Lane, JJ.; Lupiano and Capozzoli, JJ., concur in separate memoranda, and Kupferman, J. P., dissents in a memorandum, as follows: Capozzoli, J., concurring. I concur with the conclusion reached by the court for all of the reasons set forth in the memorandum of decision and also for the reasons herein expressed. Because of the strong opposition to the strike on the part of the many members of the union, the rank and file membership passed a resolution authorizing the executive board to conduct a secret ballot of the membership, by mail, in order to ascertain the desire of the members as to whether the board should be authorized to call a strike of the fire fighters of the City of New York. This referendum was thereafter conducted by the Honest Ballot Association and the result of the voting was that New York City's fire fighters were *not to strike.* Unfortunately, certain officers of the union conspired to conceal the true result of the referendum from both the membership and the public and falsely announced that the membership had *voted overwhelmingly in favor of the strike.* These facts are conceded by all concerned. I am strongly of the opinion that, if the members had not been lied to by their officers, there might well have been no strike. There is no doubt that the action of the officers was a betrayal of their trust and a fraud on their fellow members, which led them into striking. It should be noted that the officers involved were later convicted for their actions. Now, of course, this does not constitute any defense, nor a justification for the strike which was thereafter called by the union and no one suggests that the union has an excuse for its action. There never should have been a strike and, in striking, there was a clear violation of law, for which the union must be held accountable. However, under the circumstances disclosed, it is fair to take the circumstances leading up to the strike into consideration on the question of the penalty to be imposed on the union and they should be considered as extenuating circumstances to be taken into account on the question of punishment. Lupiano, J., concurring. I similarly concur with the conclusion reached by the court for all of the reasons set forth in the memorandum of decision and in the concurring memorandum of Justice Capozzoli and also for the following reason. There is the further factor of the morale of the city's fire fighters which must also be weighed in determining the appropriate penalty. To view the issue of punishment abstractly, without relation to the impact it will have on the continued *esprit de corps* of the fire fighters, would be detrimental to the observance of the public good which all are required to serve. Kupferman, J., dissenting. Perhaps it is hindsight, but the current financial state of the City of New York may indicate why the city could not make "constructive" offers of settlement. The original demands by the Uniformed Firefighters Association (UFA), according to the Director of Labor Relations for the City of New York came "to a total cost of approximately three-quarters of billion dollars a year." Even assuming some provocation, this strike in the face of a judicial restraining order, subjected the citizenry of the City of New York, as the majority recognizes, to a condition of peril and danger. The City of New York in this criminal contempt proceeding asked for $1,000,000 and a two-year suspension of the dues check-off privilege. The court at Special Term conducted an inquiry into the financial condition of the UFA. There were 10,856 firemen paying dues of $4.65 every two weeks or $120.90 a year. Approximately $1,300,000

is collected in dues each year. If the check off had been suspended, the UFA had up to $2,600,000 in dues in jeopardy. The court in imposing a fine of $650,000 or approximately one half of a year's dues, provided for a payment of $100,000 with the balance to be paid by 25% of the dues check off until the remaining $550,000 was paid. There was a rational basis for this determination in the sound discretion of a knowledgeable jurist who was familiar with the entire situation. I find no objective criteria to explain the reduction in fine by the majority of this court. I would affirm. Settle order on notice.