[822 NYS2d 579]

NEW YORK CITY TRANSIT AUTHORITY et al., Respondents, v
TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO, et al.,
Defendants, and LOCAL 100 OF TRANSPORT WORKERS UNION
OF AMERICA, AFL-CIO, Appellant.

Second Department, October 3, 2006

**APPEARANCES OF COUNSEL**

*Schwartz Lichten & Bright, P.C.*, New York City (*Arthur Z. Schwartz* and *Daniel R. Bright* of counsel), for appellant.

*Eliot Spitzer, Attorney General*, New York City (*Caitlin J. Halligan, Gregory Silbert, Robert Goldfarb, Benjamin Gutman* and *Neil H. Abramson* of counsel), and *Martin B. Schnabel*, Brooklyn, for respondents. (One brief filed.)

*Michael A. Cardozo, Corporation Counsel*, New York City (*Leonard Koerner, Alan M. Schlesinger* and *William S. J. Fraenkel* of counsel), for City of New York, amicus curiae.

*David Goldberg*, New York City, and *Brennan Center for Justice at NYU School of Law*, pro se (*David S. Udell, Paul K. Sonn* and *Jennifer Sung* of counsel; *Chitra G. Aiyar* and *Rajesh Nayak* on the brief), for Brennan Center for Justice at NYU School of Law, amicus curiae.

## OPINION OF THE COURT

MILLER, J.P.

Shortly before Christmas 2005, the members of various transportation workers' unions went on strike in the City of New York, in violation of a previously issued injunction. As is relevant to this appeal, as a result of that violation, following a bench trial, the appellant, Local 100 of Transport Workers Union of America, AFL-CIO (hereinafter Local 100), subsequently was adjudged in contempt, and fined at the rate of $1 million per day. Among the issues presented for our review is the question of whether Local 100 had Sixth and Fourteenth Amendment rights to a jury trial on the question of its contempt. We conclude that none of Local 100's arguments has merit, and accordingly affirm the order and judgment on appeal.

### I

As alleged in its complaint, the plaintiff New York City Transit Authority (hereinafter the Transit Authority), a public benefit corporation, is responsible under section 1202 of the Public Authorities Law for the operation of transit facilities within the City of New York for the convenience and safety of the public. Public Authorities Law § 1202 (2) states that the Transit Authority shall be regarded as performing a governmental function for the benefit of the people of the State of New York. The Transit Authority maintains and operates all of the rapid transit lines within the City of New York (i.e., the subway and elevated railroad lines), as well as virtually all of the bus lines in Brooklyn and Staten Island, "substantial" numbers of bus lines in Queens, and "some" bus lines in Manhattan. More than 7.5 million passengers ride those lines each weekday. The Transit Authority alleges that it employs about 31,000 hourly-paid employees, who operate and maintain transit facilities. They are "public" employees subject to the Civil Service Law. The plaintiff Manhattan and Bronx Surface Transit Operating

Authority (hereinafter MABSTOA) is a public benefit corporation operating under section 1203-a of the Public Authorities Law. MABSTOA maintains and operates certain bus facilities, including most of the local bus lines in Manhattan, some of the local bus lines in Queens, and all of the bus lines in the Bronx. In total, each weekday, the MABSTOA lines carry more than one million passengers in the City of New York. MABSTOA employs about 5,000 hourly-paid workers, who operate and maintain its bus facilities. They are "public" employees as defined by the Civil Service Law.

The defendant Local 100 is a labor union, and is the collective bargaining representative of the maintenance and operating employees of the Transit Authority and MABSTOA, as well as the clerical employees of MABSTOA. This amounts to about 33,000 employees, including all subway operators and conductors, bus drivers, token booth clerks, bus and train mechanics, and track workers in the City of New York, save for Staten Island. The plaintiffs alleged that most of their employees engaged in the operation and maintenance of the plaintiffs' transit facilities, and are members of and represented by Local 100 for the purposes of collective bargaining.

At the time the operative events in this dispute arose, the existing collective bargaining agreement (hereinafter CBA) between Local 100 and the plaintiffs began on December 16, 2002, and was due to expire at 12:01 A.M. on December 16, 2005. About 33,000 of the plaintiffs' employees were covered by that CBA. Starting in mid-October 2005, Local 100 entered into negotiations for a new CBA.

Prior to the expiration of the CBA in mid-December 2005, with no successor agreement yet in place, officers and members of Local 100 made statements to the press and engaged in activities indicating that they planned to strike if a new CBA was not in place effective December 16, 2005. On December 10, 2005, Local 100 conducted a mass meeting of its members. The members present voted unanimously to authorize Local 100's Executive Board to call a strike in the event no agreement was reached on a new CBA by the time the existing one expired.

On December 12, 2005, the plaintiffs commenced this action pursuant to article 14 of the Civil Service Law—the Fair Employment Act, otherwise known as the Taylor Law (Civil Service Law §§ 200-212). Among other things, the plaintiffs sought an injunction to prevent Local 100 and its members from striking. At the same time, the plaintiffs moved by order

to show cause for a preliminary injunction to prevent a strike during the pendency of the action. The motion, opposed by Local 100, came before the Supreme Court, Kings County, on December 13, 2005. The court heard the parties' arguments, and then issued the requested preliminary injunction. On December 14, 2005, the court issued a decision setting forth the court's rationale for the December 13, 2005, order.

Despite the preliminary injunction, at 3:01 A.M. on December 20, 2005, Local 100 went on strike. Most of the plaintiffs' hourly-paid employees complied with the call for a strike, and thereby shut down the plaintiffs' mass transit facilities.

Accordingly, by order to show cause dated December 20, 2005, the plaintiffs moved, inter alia, pursuant to Judiciary Law §§ 750 and 751 to adjudge Local 100 guilty of criminal contempt for the willful violation of the December 13, 2005, preliminary injunction by engaging in the strike. As a sanction against Local 100 for that alleged violation, the plaintiffs sought a $1 million fine for the violation of the preliminary injunction on December 20, 2005, with successive doubling of that fine for each day it continued on strike (i.e., $2 million for and in the event of a second day of striking, $4 million for and in the event of a third, and so forth).

Counsel for the unions were alerted early on the morning of December 20, 2005, that the plaintiffs intended to make the contempt motion. Counsel for the parties appeared in court between 4:30 A.M. and 5:00 A.M., at which time the court signed the plaintiffs' order to show cause, making the motion returnable at 11:00 A.M. that same day. The plaintiffs submitted a memorandum of law, in which they requested that should it be adjudged in contempt, Local 100 be required to pay an "immediate" fine of $1 million for the December 20, 2005, violation of the preliminary injunction, with a "prospective" penalty doubling the amount of the fine for each day of continued disobedience, "to ensure future compliance."

Local 100 submitted a prehearing memorandum of law in which it argued, inter alia, that it had not been afforded reasonable notice of the contempt proceeding, in violation of its right to due process. It also argued that it had a Sixth Amendment right to a jury trial on the issue of contempt. Local 100 further claimed that the plaintiffs provoked the strike, and that the proposed fines were excessive.

Later that morning, the Supreme Court conducted a hearing on the plaintiffs' contempt motion. Immediately prior thereto,

after hearing argument on the issue, the court denied the application of Local 100 for a jury trial on the contempt issue.

Counsel for Local 100 stipulated that at 3:00 A.M. on December 20, 2005, Local 100's President, Roger Toussaint, announced to the media that the Executive Board of the Local had voted to authorize a strike, and that the transit system was "closed down in large measure." Earlier in the proceedings, Local 100's counsel had conceded that "[e]verybody knows there's a transit strike."

Among other things, to demonstrate the impact of the strike upon the City and its residents, the plaintiffs submitted the affirmation of Joseph F. Bruno, Commissioner of the New York City Office of Emergency Management, which the court received in evidence. Bruno stated, inter alia, that in the last 39 years, the City had experienced two extended transit strikes, both of which caused complete disruption to life in the city, which is "heavily dependent on . . . public bus and subway service." He alleged that during each day of a strike, the City would lose between approximately $8 million and $12 million in tax revenue (consisting of the total losses in daily sales tax revenue, business income tax revenue, and personal income tax revenue), and that businesses would suffer losses of between $440 million and $660 million per day. Bruno referred to the 11-day 1980 transit strike in support of his position. For example, during that strike, businesses in the city suffered losses of about $1.1 billion. In addition, the City lost $1 million per day in sales tax revenue and $500,000 in income tax revenue for each day of the strike. Thus, the loss in sales and income tax revenues to the City amounted to approximately $16.5 million for the 11-day strike. Direct monetary losses to the City (e.g., overtime costs for police, fire, and transportation personnel) were about $3.1 million per day. Bruno alleged that in 2005, the cost for additional police activity alone would be more than $10 million per day. Additional costs to the New York City Department of Transportation were alleged to be $142,000 per day, and costs for staffing and operating the City's Emergency Operations Center would exceed $70,000 per day.

Furthermore, Bruno stated that a strike would affect the health and safety of New Yorkers. For example, increased traffic volume would slow the response time of emergency vehicles, thus putting lives at risk. During the 1980 strike, traffic flow into Manhattan increased by 26%, and there was a "sharp decrease" in the number of people who visited clinics and emer-

gency rooms operated by the New York City Health and Hospitals Corporation.

Education of the city's children also would be affected. Almost 500,000 children attending schools in the city rely on public transportation to travel to and from school, and might not be able to get there in the event of a strike. Bruno alleged that based on the experience of the 1980 strike, tens of thousands of students would not attend school in the event of a transit strike.

Bruno further alleged that the damages caused by the 1980 transit strike would "pale in comparison" to a strike in 2005, since the public had come to depend more on public transportation in the intervening years. At the time of the April 1980 strike, the public transportation system served about 4.8 million passengers each weekday. In 2005, ridership was about 7.5 million passengers each weekday. Furthermore, in 1980, the strike took place in April. A strike taking place during the 2005 Christmas holiday season would have a "devastating" effect on a number of industries in the city which relied on business during the holiday period, such as the retail and tourism industries.

The plaintiffs submitted evidence regarding the assets of Local 100, in the form of a Department of Labor financial statement, which showed that for the 2004 calendar year, the local had over $3.6 million in net assets. Also submitted was a news report, dated December 2, 2005, stating that the local had received an offer of $60 million for the building housing its headquarters, located on the Upper West Side of Manhattan. During his separate testimony, further described below, the general counsel of Local 100 stated that the real estate corporation that owned the building was "essentially owned" by Local 100.

During its case, Local 100 presented the testimony of its general counsel, Walter Meginniss. Among other things, he testified as follows. Meginniss explained that the last CBA between Local 100 and the plaintiffs was executed on December 16, 2002. He further explained how Local 100 set up committees and assigned individuals to negotiate the new CBA with the Transit Authority, whose lead negotiator was Gary Dellaverson of the Metropolitan Transportation Authority (hereinafter MTA). He stated that formal negotiations for a new CBA began on October 14, 2005, and that in anticipation of the negotiations, Local 100 prepared a list of demands and proposals, which was transmitted to the MTA. Meginniss stated that the MTA did not submit any proposals at that time.

The next bargaining session was held on October 25, 2005. At that session, the MTA made a presentation in connection with

its budget and financial situation. Meginniss stated that the MTA mentioned that its pension costs "presented a challenge for the agency," and were contributing to a "structural deficit." At the next session, held on November 10, 2005, there was a discussion of the MTA's finances, and its difficulties in accurately predicting its financial position. Local 100 was concerned that the MTA's 2005 projections had varied from an initial projection of a deficit to more recent projections of a large surplus. The MTA again raised the cost of pensions, but it did not make any specific proposals with respect to that issue. The negotiators reconvened on November 22, 2005, at which time the MTA informed the unions that it owed a significant debt to the various pension plans it funded, and that it was interested in using some of the 2005 budget surplus to pay down that debt. Local 100, on the other hand, disputed the MTA's position that the foregoing course would benefit its members, and presented its positions with respect to wages, health benefits, and working conditions. At the conclusion of the November 22, 2005, bargaining session, Dellaverson suggested splitting up into working groups, each to tackle an individual issue. None of the groups, however, was assigned to address pensions.

At the bargaining session on December 1, 2005, Local 100 raised a concern that several programs promised in the 2002 CBA, such as an apprenticeship program, had not been fully implemented by the MTA. At the end of that session, Dellaverson delivered a letter indicating that the MTA desired to go to arbitration on December 16, 2005, to determine the terms of the new CBA, notwithstanding the fact that it had yet to make any economic proposals to the unions. Local 100 officials were angry at this communication, and believed, as a consequence, that the MTA was not bargaining in good faith.

On December 7, 2005, the MTA made its first substantive economic proposal. Among other things, the proposal suggested that new hires participate in a newly-created pension tier that required the new hire to make a contribution equal to 3% of the wages of the new hire, with a retirement age of 62. As explained by Meginniss, current Local 100 members who had been hired by the Transit Authority since 1994 had pensions which allowed them to retire with a full benefit at age 55, provided they had 25 years of service, while the new proposal would have changed that entitlement so that new hires would only be able to retire at age 62. In addition, Meginniss asserted that under current law, Transit Authority employees were only required to contrib-

ute 2% of their own wages into the pension plan, while the proposal would have required new hires to contribute 3%. Local 100 rejected the employer's proposal.

According to Meginniss, MTA Chair Peter Kalikow joined the negotiations for the first time late in the evening on December 15, 2002, about one hour before expiration of the existing CBA. At about 3:00 or 4:00 A.M. on December 16, 2005, Kalikow said that the settlement of a new CBA was contingent on a change in the pension structure, and that the offer on the table was his "final offer." According to Meginniss, Local 100 rejected the offer because of the proposed change in pension structure. At 10:00 A.M. on December 16, 2005, Kalikow informed the media that the parties were at an impasse.

At that point, Local 100 set a strike deadline for 12:01 A.M. on December 20, 2005, against the publicly-owned subway and bus systems of the Transit Authority and MABSTOA. Nonetheless, according to Meginniss, the MTA continued to press its proposal with respect to pensions, except that it lowered the proposed retirement age of new hires from 62 to 55, but increased the proposed contribution of new hires to 6%, rather than the 2% applicable to current employees or the 3% it had first proposed for new hires. Local 100 rejected the proposal, but made a counter-proposal that the parties jointly support legislation restructuring the retirement age for pension eligibility of new hires, which was a nonmandatory subject of collective bargaining.

Meginniss confirmed the accuracy of the contents of the financial statement of Local 100 that the plaintiffs had submitted, and confirmed that a real estate holding company, wholly owned by Local 100, owned the West End Avenue headquarters of Local 100. He testified, however, that there may have been a decrease in the local's net assets since December 2004, when the financial statement had been filed.

Following the hearing, the Supreme Court issued an order and judgment which granted that branch of the plaintiffs' motion which was to adjudge Local 100 in contempt for disobeying the December 13, 2005, injunction. As for punishment, the court fined the Local the sum of $1 million per day for its disobedience, for as long as it remained on strike, beginning December 20, 2005.

Local 100 remained on strike until about 3:00 P.M. on December 22, 2005. In subsequent motion practice which is not before us on this appeal, of which we take judicial notice, the

plaintiffs moved, inter alia, for an order setting forth in a determinate amount Local 100's total contempt fine. The court granted the motion, and set the total fine to be paid by Local 100 at the sum of $2.5 million, payable to the Clerk of the court. The Supreme Court specifically recognized that Local 100 ordered its members back to work at or about midday on December 22, 2005, rather than waiting until 11:59 P.M. Thus, the total fine was arrived at by multiplying the per diem fine of $1 million by two for the first two full days of the strike, and prorating the third day to credit the local for calling off the strike at or about mid-day.

## II

██ We reject the argument of Local 100 that it was denied its Sixth and Fourteenth Amendment rights to a jury trial in connection with the contempt hearing.

## A

Enacted in 1967 to succeed the Condon-Wadlin Act, the Fair Employment Act, also known as the Taylor Law (codified at Civil Service Law §§ 200-212), prohibits strikes against public employers by unions representing public employees (*see* Civil Service Law § 210 [1]). Writing 38 years ago, in a case that rejected a due process challenge to the Taylor Law, Chief Judge Fuld explained the purpose of the law as follows:

> "Quite obviously, the ability of the Legislature to establish priorities among government services would be destroyed if public employees could, with impunity, engage in strikes which deprive the public of essential services. The striking employees, by paralyzing a city through the exercise of naked power, could obtain gains wholly disproportionate to the services rendered by them and at the expense of the public and other public employees. The consequence would be the destruction of democratic legislative processes because budgeting and the establishment of priorities would no longer result from the free choice of the electorate's representatives but from the coercive effect of paralyzing strikes of public employees." (*City of New York v De Lury*, 23 NY2d 175, 183 [1968] [citation omitted].)

In the same period of time, the Court of Appeals also held that neither public employees nor their unions are entitled, as a

matter of right, to a jury trial in a criminal contempt proceeding brought against them for violation of an antistrike injunction entered under the Taylor Law (*see Rankin v Shanker*, 23 NY2d 111 [1968]). The Court reviewed the statute and its history, and concluded that there was no legislative intent to grant such a right. There was "at least one vital reason" why trial by jury was not, in the view of the Court of Appeals, desirable in the context of determining sanctions for the violation of an antistrike injunction entered against public employees or their representative unions. "Prompt determinations," said the Court, "unencumbered by the long, drawn-out procedures involved in jury trials, are needed in criminal contempt proceedings under the Taylor Law in order to deter the continuance of paralyzing public strikes by visiting speedy punishment on the offenders" (*id.* at 117). In addition to rejecting the appellants' state-law argument in favor of the right to a jury trial, the *Rankin* court rejected various federal law contentions, including the appellants' argument that the Sixth and Fourteenth Amendments of the United States Constitution required that they be tried by a jury. Reviewing federal precedents, including *Bloom v Illinois* (391 US 194 [1968]), the Court of Appeals concluded that the right to a jury trial was confined to "serious" crimes, as opposed to " 'petty' offenses" (*id.* at 119-120). Punishment imposed for criminal contempts may be incarceration or a fine. The Court in *Rankin* noted that, for purposes of federal law, the Supreme Court had concluded that a sentence of imprisonment of six months is short enough to be petty (*id.*). Under federal law, it is now clear that any offense for which a sentence of more than six months may be imposed requires a jury trial (*see Mine Workers v Bagwell*, 512 US 821, 826 [1994]; *United States v Twentieth Century Fox Film Corp.*, 882 F2d 656, 662 [1989], *cert denied* 493 US 1021 [1990]).

*Rankin*, which concerned a teachers' strike, involved a fine on the subject union of $10,000 per day (or 1/52 of the union's total annual membership dues, whichever was less), and the Court found that it was not serious as a matter of law, adopting the then-prevailing federal, bright-line rule that the serious/petty distinction was only relevant where a prison sentence was at issue (*see Matter of Department of Hous. Preserv. & Dev. of City of N.Y. v Deka Realty Corp.*, 208 AD2d 37, 46-47 [1995] [reviewing *Rankin* and contemporaneous federal authorities]). A fine, "even though sizeable in amount, furnishes no valid criterion for the [appellants'] claim that the contempt charged against them constitutes a serious crime" (*Rankin v Shanker*, *supra* at 120).

In light of *Rankin*, Local 100 does not contend that the Taylor Law accorded it the right to a jury trial. Nor does it argue that the New York State Constitution did so. It limits its argument to the Sixth and Fourteenth Amendments of the United States Constitution, and relies on *Mine Workers v Bagwell* (512 US 821 [1994]), decided 26 years after *Rankin*. As we noted in *Matter of Department of Hous. Preserv. & Dev. of City of N.Y. v Deka Realty Corp. (supra)*, *Bagwell* held that the imposition of *serious* criminal contempt fines, without an accompanying prison term, constitutionally requires a jury trial if demanded. Thus, in light of *Bagwell*, we must update *Rankin* to the extent of determining whether, as applied to the facts of this Taylor Law case, the Sixth and Fourteenth Amendments of the United States Constitution required a trial by jury of the contempt issue.

### B

We note that the Sixth Amendment right to a jury trial in a contempt proceeding arises only in criminal, as opposed to civil, contempt cases (*see Mine Workers v Bagwell, supra* at 826-827). As is clear from a reading of *Bagwell*, drawing the distinction between the two types of contempt is not always straightforward, and even where one may conclude that the contempt at issue is criminal, the jury-trial right attaches only in the case of "serious" crimes (*see Mine Workers v Bagwell, supra* at 827; *Bloom v Illinois, supra; Matter of Department of Hous. Preserv. & Dev. of City of N.Y. v Deka Realty Corp., supra*). Although the plaintiffs moved in the Supreme Court to impose a sanction for Local 100's alleged "criminal" contempt, under Judiciary Law sections which use the word "criminal" (*see* Judiciary Law §§ 750, 751), neither the parties' characterization of the relief sought, nor the wording of the Judiciary Law, controls the federal constitutional analysis (*see Hicks v Feiock*, 485 US 624, 630 [1988]). It is the substance of the proceeding and the character of the relief that is critical and controlling (*id.; see Mine Workers v Bagwell, supra* at 828; *Matter of Department of Hous. Preserv. & Dev. of City of N.Y. v Deka Realty Corp., supra* at 48).

*Bagwell* involved the violation by a union of an injunction in the coal mining industry, and the issue presented was whether $52 million in fines levied against the petitioner unions were "coercive" civil, as opposed to criminal, fines.

The petitioners' labor dispute with the coal mining companies involved certain allegedly unfair labor practices. In April 1989,

the companies sued in Virginia state court to enjoin the petitioners from conducting unlawful strike-related activities. The trial court issued a detailed injunction which restrained the unions and their members, inter alia, from "obstructing ingress and egress" to the companies' facilities, throwing objects and physically threatening employees, placing tire-damaging devices on roads passed by the companies' vehicles, and picketing with more than a certain number of people at specified sites (*Mine Workers v Bagwell, supra* at 823-824).

In May 1989 the trial court held a contempt hearing, and determined that the petitioners had committed 72 violations of the injunction. The unions were fined the sum of $642,000, and the trial court stated that it would fine the unions the sum of $100,000 for future violent disobedience of the injunction, and $20,000 for nonviolent breaches. The court stated that its aim was to impose prospective, civil fines. The $642,000 fine ultimately was vacated based on the court's determination that it was "criminal" (*Mine Workers v Bagwell, supra* at 824 n 1).

Thereafter, there were seven additional contempt hearings, which were not held before a jury, as a result of which the unions were found in contempt for over 400 separate violations of the injunction. The court imposed more than $64 million in fines on the unions, about $12 million of which was to be paid to the companies. The remaining $52 million was to be paid to the Commonwealth of Virginia, and the two counties most heavily affected by the unlawful activity, in part due to the law enforcement burdens the strike created (evidently some of the injunction violations had been violent) (*see Mine Workers v Bagwell, supra* at 824-825).

The unions and the companies settled their dispute. As is relevant here, the Supreme Court of Virginia ultimately rejected the contention that the $52 million fine, payable to the Commonwealth, was criminal in nature, and thus could not be imposed without the protections normally accorded in a criminal trial. The court determined that the trial court's prospective fine schedule was to coerce compliance with the injunction, and that the unions could simply comply and avoid the fines. Thus, the fines were civil in nature and could be imposed in a civil proceeding (*Mine Workers v Bagwell, supra* at 825-826).

The United States Supreme Court reversed. The Supreme Court initially reviewed some general principles, which we review as well, in order to aid in the understanding of our analysis below.

Preliminarily, it should be noted that this situation involves an indirect contempt, that is, a contempt that took place outside of the presence of the court. By contrast, as the Court noted in *Bagwell*, direct contempts occurring in the court's presence may be sanctioned "summarily" (*Mine Workers v Bagwell, supra* at 827 n 2).

A contempt sanction is viewed as civil if it is "remedial," and for the benefit of the complainant, but is criminal if its purpose is punitive, and to " 'vindicate the authority of the court' " (*Mine Workers v Bagwell, supra* at 827-828, quoting *Gompers v Bucks Stove & Range Co.*, 221 US 418, 441 [1911]; *see also Hicks v Feiock, supra* at 624, 631). Coercive penalties designed to modify the contemnor's behavior, generally speaking, are civil in nature, while penalties meant to punish the contemnor for past acts of disobedience are criminal.

Contempt sanctions may involve imprisonment or fines. The sanction of imprisonment is not necessarily criminal. For example, imprisonment for a fixed term, during which the contemnor may "purge" the contempt and obtain early release by committing an affirmative act, is a coercive, civil penalty (*Mine Workers v Bagwell, supra* at 828). A fixed sentence of imprisonment is viewed as criminal if imposed retrospectively for a completed act of disobedience, and where the contemnor cannot shorten or avoid prison through later compliance (*id.* at 828-829).

Where a fine is involved, it is considered civil and remedial if it either coerces the recalcitrant party into compliance with a court order, or compensates the claimant for some loss (*Mine Workers v Bagwell, supra* at 829, citing *United States v Mine Workers*, 330 US 258, 303-304 [1947]). If a fine is not compensatory, it is civil only if the contemnor is given an opportunity to purge (*id.*).

As an analogy to coercive imprisonment, the Court cited the per diem fine—levied for each day a contemnor does not comply with an affirmative court order. The two penalties are similar, since they "exert a constant coercive pressure;" once the court order is honored, "the future, indefinite, daily fines are purged" (*id.*).

Making the distinction between civil and criminal contempts is not a mere formalistic exercise. If the contempt is characterized as criminal, then greater procedural protections apply, such as, among other things, the right to have the contempt proved beyond a reasonable doubt, and the right to the assistance of counsel (*id.* at 826-827).

Once it is determined that a contempt sanction is criminal, however, the Sixth Amendment right to a jury trial does not automatically attach. An additional inquiry must be made, and that is whether the offense is "serious" or "petty"—if the latter, the right to a jury trial is not applicable (*see Hicks v Feiock*, *supra* at 632 n 5; *Bloom v Illinois, supra* at 208-210; *Matter of Department of Hous. Preserv. & Dev. of City of N.Y. v Deka Realty Corp., supra* at 48). Where the criminal contempt sanction is imprisonment, the serious/petty distinction is triggered at imprisonment of six months; the right to a jury trial attaches only where the term is more than six months (*see Mine Workers v Bagwell, supra* at 826-827). Where the criminal contempt sanction is a fine, there is no bright-line rule governing the distinction.

In contrast to the Virginia Supreme Court, the United States Supreme Court in *Bagwell* concluded that the $52 million fine was criminal in nature, for several reasons. The Court observed that neither the parties nor any court had suggested that the fines there involved were compensatory. Indeed, there was no evidence of any request for compensation, nor was there any evidence of private injuries sustained. But that factor alone was not dispositive. Also of relevance was the fact that the injunction the unions violated was, in effect, a "detailed code of conduct" the court had imposed (*Mine Workers v Bagwell, supra* at 835-836). The unions' contumacy, according to the Court, did not involve "simple, affirmative" acts (*id.* at 837). Rather, the state court "levied contempt fines for widespread, ongoing, out-of-court violations of a complex injunction," and "[i]n so doing, the court effectively policed [the unions'] compliance with an entire code of conduct that the court itself had imposed" (*id.*). The contumacy lasted months, and evidently "spanned a substantial portion" of the Commonwealth of Virginia (*id.*). As noted above, numerous contempt hearings were held. In addition, the fine imposed—$52 million—was in the Court's view (evidently given its magnitude) "unquestionably . . . serious" (*Mine Workers v Bagwell, supra* at 837 n 5). Each of the foregoing factors combined to mandate "disinterested factfinding and evenhanded adjudication"—that is, a trial by jury (*Mine Workers v Bagwell, supra* at 837-838).

We now turn to the application of *Bagwell* to the facts of this case.

## C

The parties have characterized the fines imposed in an all-or-nothing fashion. The plaintiffs contend that the entire fine was civil in nature (seemingly in opposition to the position they took in the Supreme Court), whereas Local 100 characterizes it as entirely criminal. The Supreme Court's December 20, 2005, order and judgment simply granted the plaintiffs' contempt motion to the extent of ordering Local 100 to pay $1 million per day beginning that same day. In light of the fact that the relevant branch of the plaintiffs' motion sought an "immediate" fine of $1 million for the December 20, 2005, violation of the antistrike injunction, which had already occurred prior to making of the motion and the Supreme Court's ruling thereon, and then a doubling of the fine for each day the local's disobedience persisted, we conclude that the fines imposed in this case had both a retrospective, criminal component *as well as* a prospective, civil component. Part of the fines imposed were designed to punish Local 100 for violation of the preliminary injunction that occurred prior to the contempt adjudication, and the remaining part was designed to compel the local to end the strike and get the transit system up and running.

The latter portion was, in our view, civil in nature. It could have been avoided had the local directed its members back to work once the Supreme Court issued its judgment. The reason that Local 100 incurred fines for postjudgment conduct is because it continued with its violation of the December 13, 2005, preliminary injunction; clearly the fines would have been heavier had the union continued with the strike beyond December 22, 2005. We conclude that this portion of the fine was in the nature of a coercive, per diem sanction meant to compel Local 100 to alter its conduct to comply with the December 13, 2005, order. We also note that unlike the situation in *Bagwell*, the December 13, 2005, order was basically a "no-strike" injunction. As such, while it certainly was meant to direct Local 100's members back to work, it was not in any way akin to the "detailed code of conduct" imposed by the Virginia court in *Bagwell* which the contempt hearing was designed to "police." Indeed, in *Bagwell*, there were multiple contempt hearings resulting in adjudications of hundreds of different contempts, which were the subjects of separate fines, the severity of which depended on the level of violence involved (*Mine Workers v Bagwell, supra* at 824). We do not see a parallel here.

Thus, under the circumstances of this case, there was no Sixth Amendment right to a jury trial in connection with the prospec-

tive portion of the Supreme Court's sanction. There was such a right in connection with the retrospective portion only if the fine involved was "serious" (*id.* at 836-838; *see Duncan v Louisiana,* 391 US 145, 159-162 [1968]; *Matter of Department of Hous. Preserv. & Dev. of City of N.Y. v Deka Realty Corp., supra* at 47-49).

Of course, our characterization raises the question of precisely what part of the total fines ultimately imposed pertains to Local 100's prejudgment conduct, and what part to the postjudgment conduct. It is not entirely clear that Local 100 was fined the total per diem amount of $1 million for its prejudgment disobedience. It is not evident precisely when during December 20, 2005, the court issued its ruling, but it is clear that the ruling was issued before the first 24-hour period of the strike came to a close. The local was fined $1 million per day starting that day. We make this observation because it is questionable whether the Supreme Court intended to prorate the per diem fine for the portion of the day preceding the judgment, as it ultimately did with respect to the last day of the strike. In our view, it is unnecessary to resolve this issue, because even assuming the criminal contempt fine was the full per diem amount of $1 million, given Local 100's financial circumstances and its ability to spread the fine over an extremely large membership, it was not "serious" within the meaning of the jury trial contempt case law (*see Muniz v Hoffman,* 422 US 454, 477 [1975]; *United States v Troxler Hosiery Co., Inc.,* 681 F2d 934, 936-937 [1982]; *Pabst Brewing Co. v Brewery Workers Local Union No. 77, AFL-CIO,* 555 F2d 146, 152 [1977]; *cf. United States v Twentieth Century Fox Film Corp.,* 882 F2d 656, 663 [1989], *cert denied* 493 US 1021 [1990]). We see no reason why Local 100 may not satisfy the criminal portion of the contempt fine imposed upon it by spreading the cost over its membership, which would require each member of Local 100 to pay about $30. (This assumes that the local's membership is 33,000, which is the figure the plaintiffs alleged in the complaint, and which Local 100 supplied in its brief on appeal. The record in *New York City Tr. Auth. v Amalgamated Tr. Union, Local 726, AFL-CIO* [33 AD3d 595 (2006) (decided herewith)] puts the figure at 34,000. The difference is immaterial to our analysis and conclusion.) We further note that Local 100 has substantial assets, put at about $3.6 million on its calendar year 2004 Department of Labor financial statement—and that does not include the valuable West End Avenue real estate which its

counsel conceded the local indirectly owns through a holding company. We conclude that the foregoing is not a "serious" penalty that requires a jury trial before it may be imposed (*see Muniz v Hoffman, supra; United States v Linney,* 134 F3d 274, 281 [1998], *cert denied* 523 US 1143 [1998]; *Pabst Brewing Co. v Brewery Workers Local Union No. 77, AFL-CIO, supra; Matter of Department of Hous. Preserv. & Dev. of City of N.Y. v Deka Realty Corp., supra*).

To be sure, the foregoing analysis proceeds by hindsight, in that we are determining, after the contempt fine is imposed, whether it was "serious." In other words, as has been observed elsewhere, "the right to a jury trial may not be clear until after the trial" (*United States v Twentieth Century Fox Film Corp.,* 882 F2d 656, 662 n 3 [1989], *cert denied* 493 US 1021 [1990]). This suggests that the federal constitutional analysis should proceed based on what fine is *sought,* as opposed to what is *actually imposed,* but in fact, it is the latter criterion that governs (*see Frank v United States,* 395 US 147, 149 [1969]; *United States v Linney,* 134 F3d 274, 280 [1998], *cert denied* 523 US 1143 [1998]; *United States v Twentieth Century Fox Film Corp., supra* at 662).

## III

We disagree with Local 100's contention that it was entitled to have a jury consider the issue of the MTA's alleged "extreme provocation." Local 100 argues that the MTA's insistence that the Local agree to changes in the pension system was improper, as pension changes are a prohibited subject of collective bargaining (*see* Civil Service Law § 201 [4]). As such, the Local further contends that the MTA's proposal demonstrated a failure to bargain in good faith, constituted "extreme provocation," and should have been considered by a jury in mitigation of the fines imposed. Even if we assume that the MTA's pension proposal for new hires constituted "extreme provocation"—a proposition with which we do not agree—we note that, as Meginniss conceded at the hearing, it does not constitute a legal defense to a motion to hold a public-employee association in contempt for violating the no-strike provisions of a preliminary injunction order (*see Board of Educ. of City School Dist. of City of Buffalo v Pisa,* 55 AD2d 128, 138-139 [1976]). Nor is it a basis for mitigation of the contempt fines. As further discussed below, under Judiciary Law § 751 (2) (a), "extreme provocation" is a *discretionary* factor to be considered in the fixing of the contempt fine.

## IV

■ We also reject Local 100's argument that it was denied due process because it was not afforded a reasonable amount of time to prepare a defense to the allegations of contempt (*see* Judiciary Law § 751 [1]; *Matter of Spector v Allen*, 281 NY 251, 256-257 [1939]; *Orchard Park Cent. School Dist. v Orchard Park Teachers Assn.*, 50 AD2d 462, 468 [1976]; *Beth-El Hosp. v Davis*, 16 AD2d 934 [1962]). Clearly, Local 100 had notice of the December 13, 2005, preliminary injunction, and just as clearly, it disobeyed that injunction by engaging in a strike. What constitutes a "reasonable" time to prepare a defense depends upon the particular circumstances of each case (*see Matter of Spector v Allen, supra* at 256). Here, in light of the conduct of Local 100, which caused immediate and continuing irreparable harm to the enormous number of people dependent on the New York City transit system, and in light of the fact that it really had no defense to offer—it all but conceded as much at the hearing (*see Beth-El Hosp. v Davis, supra* at 934-935)—we conclude that the due process argument of Local 100 is without merit.

## V

■ In addition, the fines imposed were not excessive. Judiciary Law § 751 (2) (a) authorizes the court, in a case growing out of a strike held in violation of Civil Service Law § 210, to punish a public-employee union that willfully disobeys a mandate of the court with, inter alia, "a fine fixed in the discretion of the court." Such a fine may include a fine for "each day that such contempt persists." (Judiciary Law § 751 [2] [a].) In fixing the amount of the fine, the court is directed to consider all the facts and circumstances directly related to the contempt, including, but not limited to: (1) the extent of the willful defiance of or a resistance to the court's mandate, (2) the impact of the strike on the public health, safety, and welfare of the community, and (3) the ability of the employee organization to pay the fine imposed (Judiciary Law § 751 [2] [a]). In addition, the court has the *discretion* to consider, as additional factors, whether either the union or the employer refused to submit to mediation and, if alleged by the union, whether the employer "engaged in such acts of extreme provocation as to detract from the responsibility of the employee organization for the strike." (Judiciary Law § 751 [2] [a].)

In the instant dispute, the Supreme Court stated on the record that it had considered the statutory factors "very carefully."

Based upon our independent review of the record, we conclude that the court providently exercised its discretion in connection with the amount of the fines imposed. It properly considered and weighed the statutory factors identified above in arriving at the fines. Moreover, the determination made by the Supreme Court was in line with the fines imposed upon similarly-situated public employee unions held to have violated similar court mandates (*see County of Rockland v Civil Serv. Empls. Assn.*, 62 NY2d 11 [1984]; *Goodman v State of New York*, 31 NY2d 381 [1972]; *Burns Jackson Miller Summit & Spitzer v Lindner*, 88 AD2d 50, 55 [1982] *affd* 59 NY2d 314 [1983]; *City of New York v Vizzini*, 49 AD2d 833 [1975]; *Caso v District Council 37, Am. Fedn. of State, County & Mun. Empls., AFL-CIO*, 43 AD2d 159, 161 [1973]).

In particular, we note that in the context of the 11-day April 1980 transit strike, Local 100 was fined $750,000 (*see Burns Jackson Miller Summit & Spitzer, supra* at 55). We are not persuaded that 25 years later, the fine imposed here for a $2^{1}/_{2}$-day strike just prior to the holiday season of 2005 was, under the circumstances, in any way excessive.

## VI

We have considered the remaining contentions of Local 100, as well as the contentions of the amicus curiae, and conclude that they either are unpreserved for appellate review, or are without merit.

Accordingly, the order and judgment is affirmed.

LUCIANO, LIFSON and COVELLO, JJ., concur.

Ordered that the order and judgment is affirmed, with costs.